LAW OFFICES
## WILLIAM J. GEARTY
A PROFESSIONAL CORPORATION
301 Morris Avenue
SPRING LAKE, NEW JERSEY   07762

(732) 449-1114
———
FAX:  (732) 449-7292

January 2, 2009

<u>Via Electronic Filing</u>
Clerk's Office
United States District Court
District of New Jersey
Clarkson S. Fisher Federal Building & U.S. Courthouse
402 E State Street
Trenton NJ   08608

       **Re:**    *Villari v. Township of Wall, et als*
             *Docket No.:   3:06-cv-4 (FLW)*

Dear Sir/Madam:

Enclosed herein please find Notice of Motion for Summary Judgment returnable February 2, 2009 before Honorable John J. Hughes.  This is supported by a Statement of Material Facts as to which there does not exist a genuine issue, Certifications of Defendants Nash and William J. Gearty, police report and copy of depositions.

Very truly yours,

*/s/ William J. Gearty*

William J. Gearty

WJG\mb

Enclosures

cc:    Layni Rothbort, Esq.
             - and Certified Mail, RRR 7004 2510 0007 3393 0873 -
    John T. Bazzurro, Esq.
    John J. Bonello, Esq.

**WILLIAM J. GEARTY, ESQUIRE**
301 Morris Avenue
Spring Lake, New Jersey 07762
Telephone:  (732) 449-1114
Facsimile:  (732) 449-7292
Attorney for defendant, Officer Nash
wgearty@verizon.net
_____

| | |
|---|---|
| DAVID K. VILLARI,      : | UNITED STATES DISTRICT COURT DISTRICT OF NEW JERSEY |

DAVID K. VILLARI,                       :        UNITED STATES DISTRICT COURT
                                                          DISTRICT OF NEW JERSEY
          Plaintiff,                        :
                                                          Civil Action No. 06-CV-4 (FLW)
v.                                              :
                                                          U.S. Magistrate John J. Hughes
TOWNSHIP OF WALL, TOWNSHIP OF   :
WALL POLICE DEPARTMENT, SCOTT                    Civil Action
FIFIELD, S. NASH, BADGE #157,         :
SERGEANT PROMPHREY, JOHN DOE,             **NOTICE OF MOTION FOR**
being a fictitious name, WEARING BADGE  :
#151, SERGEANT E. P. LOKERSON,        **SUMMARY JUDGMENT ON**
BADGE #119, E. LISTER, BADGE #142,    :
MICHAEL MALONE, BADGE #153, John          **BEHALF OF DEFENDANT,**
Does #1 - 10,                                :
                                                          **STEVEN NASH**
          Defendants.                     :


_____

TO:   **LAYNI S. ROTHBORT, ESQUIRE**
        49 Oval Road
        Millburn, NJ   07041
        Attorney for Plaintiff

        **JOHN L. BONELLO, ESQUIRE**
        Manna & Bonello, Esqs.
        648 Ocean Avenue
        West End, NJ   07740
        Attorney for Defendants, Township of Wall, Township of Wall Police Department,
        Sgt. Promphrey, Sgt. E.P. Lokerson, Michael Malone

**JOHN BAZZURRO, ESQUIRE**
Chamlin, Rosen, Uliano & Witherington
268 Norwood Avenue
P.O. Box 38
West Long Branch, NJ   07764
Attorneys for Defendant, Nash

COUNSEL:

PLEASE TAKE NOTICE that on the 2nd day of February, 2009 or as soon thereafter as counsel may be reached, the undersigned attorney for defendant, Nash, shall make application to the United States District Court, District of New Jersey, before the Honorable John J. Hughes, U.M.U.S.D.C. at the Fisher Federal Building & U.S. Courthouse, 402 East State Street, Room 6000, Trenton, New Jersey   08625 for an Order granting summary judgment on behalf of defendant Steven Nash.

This defendant-movant will rely upon the following documents all of which are filed herewith and made a part hereof.

| | |
|---|---|
| Exhibit A - | Statement of material facts as to which there does not exist a genuine issue; |
| Exhibit B - | Certification of defendant, Steven Nash; |
| Exhibit C - | 1 /4/04 police reports filed by Officer Nash; |
| Exhibit D - | Selected passages from the deposition testimony of the plaintiff David K. Villari taken and sworn to in this cause; |
| Exhibit E - | Certification of William J. Gearty as to the authenticity of the deposition passage produced as Exhibit C; |
| | Brief in support of this motion. |
| | Proposed form of Order granting this motion. |

The defendant-movant Steven Nash hereby requests oral argument of the motion.

/s/ William J. Gearty

_____
WILLIAM J. GEARTY
Attorney for Defendant Steven Nash

CERTIFICATION

1.      I the undersigned am employed by the firm of William J. Gearty, attorney for the defendant.

2.      On the date listed below, I served a copy of the within notice of motion, statement of material facts as to which there does not exist a genuine issue, supporting certifications with exhibits, brief and proposed form of order upon all parties at the addresses which appear below by way of electronically filing same with the Clerk of the United States District Court, District of New Jersey, Clarkson S. Fisher Federal Building U.S. Courthouse, 402 E State Street, Trenton, NJ   08608:

**LAYNI S. ROTHBORT, ESQUIRE**
49 Oval Road
Millburn, NJ   07041
Attorney for Plaintiff

**JOHN L. BONELLO, ESQUIRE**
Manna & Bonello, Esqs.
648 Ocean Avenue
West End, NJ   07740
Attorney for Defendants, Township of Wall, Township of Wall Police Department,
Sgt. Promphrey, Sgt. E.P. Lokerson, Michael Malone

**JOHN BAZZURRO, ESQUIRE**

Chamlin, Rosen, Uliano & Witherington
268 Norwood Avenue
P.O. Box 38
West Long Branch, NJ   07764
Attorneys for Defendant, Nash

3.      On the date listed below, I additionally served a copy of the within notice of motion, statement of material facts as to which there does not exist a genuine issue, supporting certifications with exhibits, brief and proposed form of order upon counsel for the plaintiff, Layni S. Rothbort, at 49 Oval Road, Millburn, NJ   07041, by placing in the United States Mail at the Post Office in Spring Lake Heights, New Jersey, a copy of the same directed to her by certified mail return receipt requested number 7004 2510 0007 3393 0873.

I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


*/s/ Marcia L. Boynton*
_____
MARCIA L. BOYNTON

Dated:  January 2, 2009

# EXHIBIT A

**WILLIAM J. GEARTY, ESQUIRE**
301 Morris Avenue
Spring Lake, New Jersey 07762
Telephone:  (732) 449-1114
Facsimile:  (732) 449-7292
Attorney for defendant, Officer Nash
wgearty@verizon.net

_____

| | | |
|---|---|---|
| DAVID K. VILLARI, | : | UNITED STATES DISTRICT COURT DISTRICT OF NEW JERSEY |
| Plaintiff, | : | |
| | | Civil Action No. 06-CV-4 (FLW) |
| v. | : | |
| | | U.S. Magistrate John J. Hughes |
| TOWNSHIP OF WALL, TOWNSHIP OF | : | |
| WALL POLICE DEPARTMENT, SCOTT | | Civil Action |
| FIFIELD, S. NASH, BADGE #157, | : | |
| SERGEANT PROMPHREY, JOHN DOE, | | **STATEMENT OF MOVANT NASH** |
| being a fictitious name, WEARING BADGE | : | |
| #151, SERGEANT E. P. LOKERSON, | | **OF MATERIAL FACTS AS TO** |
| BADGE #119, E. LISTER, BADGE #142, | : | |
| MICHAEL MALONE, BADGE #153, John | | **WHICH THERE DOES NOT** |
| Does #1 - 10, | : | |
| | | **EXIST A GENUINE ISSUE** |
| Defendants. | : | |

_____

      The movant Steven Nash states that the material facts as to which there does not exist

a genuine issue are:

      1.      The defendant Nash was a police officer on January 4, 2004 employed by the

Township of Wall, New Jersey.  At all times mentioned herein, he was serving in his official

capacity as a police officer.  **See Exhibit B, Paragraph One**.

2.      While on patrol duty on January 4, 2004, at approximately 13 minutes after noon, Nash was dispatched to 1737 Belmar Boulevard.  Dispatch advised him that one Robert Bodtmann was at police headquarters requesting first aid.  Bodtmann had reported that plaintiff David Villari struck him in the upper left arm with a baseball bat.  He had further reported that Villari broke out two windows on the driver's side of the Bodtmann van. He reported that the shattered glass struck his two children seated in the rear and that both were covered with glass from the broken window and Joseph's hand was cut.  **See Exhibit B, Paragraph Two; Exhibit C, Page Four.**

3.      Defendant Nash approached plaintiff David Villari and his father, William Villari, and inquired as to what they had done.  Officer Nash asked Villari how the window on the van came to be broken.  Villari admitted that he broke the window out with a shovel as Bodtmann was trying to run him over.  Based on the information from dispatch and based on the statement from Villari concerning the broken windows, Nash placed him under arrest for criminal mischief, an indictable offense.  **See Exhibit B, Paragraph 3; Exhibit C, Page Four**.

4.      Villari was transported to headquarters without incident.  In addition to the criminal mischief charge, which was the basis of my arrest, he was also charged with:

2C:12-1b(2)     Aggravated Assautl (Robert Bodtmann)

2C:12-1b(3)     Aggravated Assault (Joseph Bodtmannn)

2C:12-1b(3)     Aggravated Assault (Christina Bodtmann)

2C:24-4a        Endangering the Welfare of a Child (Joseph Bodtmann)

2C:24-4a        Endangering the Welfare of a Child (Christina Bodtmann)

2C:39-4d        Possession of a Weapon for Unlawful Purpose

**See Exhibit B, Paragraph Four.**

5.      The deposition of the plaintiff was taken on February 1, 2008.  In that deposition, he described Nash's conduct during the course of his arrest.  The selected passages of that deposition appear as **Exhibit D**.  He called defendant "a nice cop."  **T112-13**.  He said he was "very nice, very polite.  He was a gentleman."  **T112-19, 20**.  He stated, "he was a gentleman.  He was very polite."  **T136**.  He also stated, "he was an officer that was a gentleman."  Again, he stated "he was a gentleman."  **T120-17**

6.      At police headquarters, Bodtmann, the other party, was charged with criminal mischief.  **Exhibit B, Paragraph Six; Exhibit C, Page Five**.

7.      Bodtmann was also transported to Jersey Shore Medical Center for the large welt on his arm where, as Bodtmann alleges, he was struck with a baseball bat by Villari. **Exhibit C, Page Eight**.

8.      I had never met Mr. Bodtmann before the January 4, 2004 date of this incident.  I had no dealings with him whatsoever.  **Exhibit B, Paragraph Eight**.

9.      At sometime, a long while after January 4, 2004 Bodtmann and Villari appeared together in court with their attorneys and dismissed all charges against one another. **Exhibit B, Paragraph Nine.**

Respectfully Submitted,

*/s/ William J. Gearty*

_____

William J. Gearty

Dated:  January 2, 2009          Attorney for defendant, Steven Nash

# EXHIBIT B -

# Signed Certification of

# Defendant Nash

# (Attached)

**WILLIAM J. GEARTY, ESQUIRE**
301 Morris Avenue
Spring Lake, New Jersey 07762
Telephone:  (732) 449-1114
Facsimile:  (732) 449-7292
Attorney for defendant, Officer Nash
wgearty@verizon.net

---

DAVID K. VILLARI,

      Plaintiff,


TOWNSHIP OF WALL, TOWNSHIP OF
WALL POLICE DEPARTMENT, SCOTT
FIFIELD, S. NASH, BADGE #157,
SERGEANT PROMPHREY, JOHN DOE,
being a fictitious name, WEARING BADGE
#151, SERGEANT E. P. LOKERSON,
BADGE #119, E. LISTER, BADGE #142,
MICHAEL MALONE, BADGE #153, John
Does #1 - 10,

      Defendants.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

Civil Action No. 06-CV-4 (FLW)

U.S. Magistrate John J. Hughes

Civil Action

**CERTIFICATION OF**

**DEFENDANT STEVEN NASH**

**IN SUPPORT OF**

**MOTION FOR SUMMARY**

**JUDGMENT**

---

Officer Steven Nash, of full age, upon his certification, deposes and says:

1.      On January 4, 2004, I was and I still am employed by the Township of Wall,

NJ as a police officer.  At all times mentioned herein, I was serving in my official capacity as

a police officer.  All of my actions and statements were made under color of law.

2.      While on patrol duty on January 4, 2004, at approximately 13 minutes after

noon, I was dispatched to 1737 Belmar Boulevard.  Dispatch advised me that Robert

Bodtmann was at police headquarters requesting first aid.  Bodtmann had reported that plaintiff David Villari struck him in the upper left arm with a baseball bat.  He further reported that Villari broke out two windows on the driver side of the van as well as the front window on the same side.  Bodtmann reported that the shattered glass struck his two children seated in the rear and that police were covered with glass from the window.  His son Joseph's hand was cut.

       3.      I was the first officer to arrive on the scene.  I approached David Villari and his father, William Villari, and enquired as to what they had done.  I asked Villari specifically how the window on the van came to be broken.  Villari admitted that he broke the window with a shovel as Bodtmann was trying to run him over.  He produced the shovel, which he used.  Based on the information from the dispatcher and based on the statement from Villari concerning the broken windows, I placed him under arrest for criminal mischief as an indictable offense.

       4.      **Villari was transported to headquarters without incident.  In addition to the** criminal mischief charge, which was the basis of my arrest, he was charged with:

| | |
|---|---|
| N.J.S.A. 2C:12-1b(2) | Aggravated Assault (Robert Bodtmann) |
| N.J.S.A. 2C:12-1b(3) | Aggravated Assault (Joseph Bodtmann) |
| N.J.S.A. 2C:12-1b(3) | Aggravated Assault (Christina Bodtmann) |
| N.J.S.A. 2C:24-4a | Endangering the Welfare of a Child (Joseph Bodtmann) |
| N.J.S.A. 2C:24-4a | Endangering the Welfare of a Child (Christina Bodtmann) |

       5.      I have reviewed the plaintiff's deposition taken on February 1, 2008.  The statement of their content appearing in the statement of material facts is accurate.

6.      While at police headquarters, Robert Bodtmann was also charged with criminal mischief.

7.      I know that Bodtmann was transported to Jersey Shore Medical Center for treatment of the large welt on his arm where he alleges he was struck with a baseball bat by Villari.

8.      I have never met Mr. Bodtmann before the January 4, 2000 date of this incident.  I had no dealings with him whatsoever.

9.      At sometime after the January 4, 2004 incident, Bodtmann and Villari appeared together in court with their attorneys and dismissed all charges against one another.

10.     Appended hereto as **Exhibit C** is a collection of all official reports filed by me concerning this incident.  I have reviewed all statements made therein.  All of them are true and accurate.

<u>CERTIFICATION</u>

I hereby certify that the foregoing statements made by me are true.  I also certify that the written reports appended are accurate and truthful.

I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated:  January 2, 2009                                    OFFICER STEVEN NASH

# EXHIBIT C -

# Wall Township Police

# Incident/Investigation

# Reports

# (Attached)

| Agency Name | INCIDENT/INVESTIGATION | | Case# |
|---|---|---|---|
| Wall Township Police Department | REPORT | | 2004-00030 |

Date / Time Reported: 01/04/2004  12:13
Last Known Secure: 01/04/2004  12:13
At Found: 01/04/2004  12:13

ORI: NJ0135200

**INCIDENT DATA**

Location of Incident: 1737 Belmar Blvd, Wall Township NJ

Premise Type: | Zone/Tract: N1, PST2

Crime Incident(s):
- #1 Aggravated Assault/ 3rd Degree- W/ Other Dangerous Weapons - 2C:12-1B.(2) (Com)
- #2 Aggravated Assault/ 3rd Degree- Aggravated - 2C:12-1B.(2) (Com)
- #3 Criminal Mischief 2C:17-3A.(2) (Com)

Weapon / Tools | Entry | Exit | Security | Activity

MO

**VICTIM**

# of Victims: 3   Type: INDIVIDUAL (NOT A LE OFFICER)   Injury: Minor Injuries, Apparent

V1 BODTMANN, ROBERT J — Victim of # 1, DOB 05/31/1963, Age 40, W, M — Resident Status: Resident

Home Address: 610 MCCABE AVE, Bradley Beach, NJ 07719-
Home Phone: 732-280-51
Employer Name/Address: COAST BUICK (MECHANIC)
Business Phone: 732-223-01

VYR | Make | Model | Style | Color | Lic/Lis | VIN

CODES: V- Victim (Denote V2, V3)  O = Owner (if other than victim)  R = Reporting Person (if other than victim)

**OTHERS INVOLVED**

Type: INDIVIDUAL (NOT A LE OFFICER)
V2 JUVENILE — Victim of Crime # 1, DOB / /, Age, W, M — Non-Resident

Type: INDIVIDUAL (NOT A LE OFFICER)
V3 JUVENILE — Victim of Crime # 1, DOB / /, Age, W, F — Non-Resident

**PROPERTY**

1 = None  2 = Burned  3 = Counterfeit / Forged  4 = Damaged / Vandalized  5 = Recovered  6 = Seized  7 = Stolen  8 = Unknown
("OJ" = Recovered for Other Jurisdiction)

| Vi# | Code | Status Frm/To | Value | OJ | QTY | Property Description | Make/Model | Serial Number |
|---|---|---|---|---|---|---|---|---|

Officer/ID#: NASH, S. (PATL, 1ST) (157)   #119
Invest ID#: (0)
Supervisor: LOKERSON, E. P. (PATL, 3RD) (119)
Complainant Signature: #157
Case Status: 5   01/04/2004
Case Disposition: 5   01/04/2004
Status: 5

Printed By: W157, PATROL_2   Sys#: 20282   Page 1   01/05/2004 13:25

2) INCIDENT WHICH IS BASIS OF THIS SUIT
①

Incident Report Additional Offense List

*Wall Township Police Department*

OCA: *2004-00030*

Offense List (Continued)

| Counter | Offense Description | Statute | Completed/Attempted |
|---------|---------------------|---------|---------------------|
| # 4 | POSS WEAPONS FOR UNLAWFUL PURPOSES (OTHE | 2C:39-4D | Com |
| # 5 | ENDANGERING THE WELFARE OF CHILD (SEXUAL | 2C:24-4A | Com |

R_CS6NC

INCIDENT/INVESTIGATION REPORT

Page 2

By: W157, PATROL_2  01/05/2004 13:25

*Wall Township Police Department*

| Case# | 2004-00030 |

Status Codes   1 = None   2 = Burned   3 = Counterfeit / Forged   4 = Damaged   5 = Recovered   6 = Seized   7 = Stolen   8 = Unknown

| | BR | Status | Quantity | Type Measure | Suspected Type | Up to 3 types of activity |
|---|---|---|---|---|---|---|
| D R U G S | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Assisting Officers
LOKERSON, E.P. (119),  LISTER, E. (142),  MALONE, M.T. (153),  MALONE, M.T. (153)

Suspect Hate / Bias Motivated:

N A R R A T I V E

REPORTING OFFICER NARRATIVE

| | | CCA |
|---|---|---|
| *Wall Township Police Department* | | *2004-00030* |
| Victim | Offense | Date / Time Reported |
| *BODTMANN, ROBERT J* | *AGGRAVATED ASSAULT/ 3RD DEGREE- W/* | *Sun 01/04/2004 12:13* |

*Should read: January 4th 2004"*

On December 4, 2003 at 1213 hours, this officer was dispatched to an officer wanted at 1737 Belmar Blvd. Before patrols arrival, this officer was advised that there was a subject at police headquarters requesting first aid. The subject requesting first aid was identified as Robert Bodtmann.

Upon patrols arrival, David Villari and his father, William Villari, was outside of the house. This officer asked Villari what was going on. Villari responded that Bodtmann came at him with a black steel pipe. Dispatched advised this officer that a window was broken out of Bodtmann's van. This officer than asked Villari how the window on the van was broke. Villari stated he broke the window out with a shovel as Bodtmann was trying to run Villari over. Villari was placed under arrest for Criminal Mischief. This officer placed Villari in the back of his vehicle and transported him to police headquarters. Villari did not want to give a statement. Villari was processed and placed into cell 1. William Villari did not want to give a statement.

Bodtmann reported he went to his previous residence, 1737 Belmar Blvd, with two of his kids, Christina (8yoa) and Joseph (6yoa), to pickup some of his things. Bodtmann said he then got out of his vehicle and opened the doors to the shed on the property when David Villari came out of the basement of the house. Villari started to curse and yell at Bodtmann in front of his children. Villari took a baseball bat from his father, William Villari, ran towards Bodtmann, and hit Bodtmann in the upper left arm. Bodtmann ran to his van and was struck in the head as Bodtmann tried to enter the van. Bodtmann started the vehicle and Villari broke out two windows on the driver's side. Bodtmann proceeded to drive around the house across the front yard. Bodtmann reports Villari ran towards the vehicle. Bodtmann then drove around the house again and then onto Belmar Blvd. Bodtmann drove to police headquarters. Bodtmann's vehicle had a broken windshield, 2 broken driver side windows, and multiple dents on the driver's side. Christina and Joseph were covered in glass from the broken windows. Joseph had a cut on his hand.

Bodtmann was transported to Jersey Shore Medical Center. Bodtmann gave a formal statement. Bodtmann was arrested for criminal mischief for driving across Villari's lawn two times.

A baseball bat with broken glass was found in the shed of 1737 Belmar Blvd. A shovel was recovered from the house.

Photographs were taken

David Villari was charged with the following:
2C:12-1b(2)    Aggravated Assault (Robert Bodtmann)
2C:12-1b(3)    Aggravated Assault (Joseph Bodtmann)
2C:12-1b(3)    Aggravated Assault (Christina Bodtmann)
2C:24-4a    Endangering the Welfare of a Child (Joseph Bodtmann)
2C:24-4a    Endangering the Welfare of a Child (Christina Bodtmann)
2C:39-4d    Possession of a Weapon for Unlawful Purpose
2C:17-3a(1)    Criminal Mischief

Bail was set by Judge Broadbelt at $175,000.
A court date of January 7, 2004

| | | | | |
|---|---|---|---|---|
| Reporting Officer: *NASH, S.* | | | Page 18 | of 6 |
| Printed By: WJ57, PATROL_2  01/05/2004 13:25 | | | | |

REPORTING OFFICER NARRATIVE

| | | OCA |
| --- | --- | --- |
| *Wall Township Police Department* | | *2004-00030* |
| Victim | Offense | Date / Time Reported |
| *BODTMANN, ROBERT J* | *AGGRAVATED ASSAULT/ 3RD DEGREE- W/* | *Sun 01/04/2004 12* |

Villari posted bail and was released.

Robert Bodtmann was charged with the following:
2C:17-3a(1)    Criminal Mischief

 

## Incident Report Suspect List

*Wall Township Police Department*

OCA : *2004-00030*

| 1 | Name (Last, First, Middle) *Villari, David* | Also Known As | Home Address *1228 ANDOVER RD BRICK, NJ 08724* *732-758-2603* |
|---|---|---|---|

Business Address *PBI INC.* *201-247-4878 ,SALES     BOULDER, COLORADO*

| DOB. *03/01/1965* | Age *38* | Race *W* | Sex *M* | Eth | Hgt *507* | Wgt *180* | Hair *BRO* | Eye *02* | Skin *MED* | Driver's License / State. *V43531567203652 NJ* |
|---|---|---|---|---|---|---|---|---|---|---|

Scars, Marks, Tattoos, or other distinguishing features
*SCAR MIDL CHEST / GLOBLADDER REMOVED;  SCAR LOWR STOMACH / APPENDIX REMOVED;  SCAR RIGH KNEE / SIX SURGURY MARKS ON KNEE;  SCAR RIGH KNEE / SIX SURGURY MARKS ON KNEE*

| Reported Suspect Detail | Suspect Age | Race | Sex | Height | Weight | SSN |
|---|---|---|---|---|---|---|

| Weapon, Type | Feature | Make | Model | Color | Caliber | Dir of Travel Mode of Travel |
|---|---|---|---|---|---|---|

| VehYr/Make/Model | Drs | Style | Color | Lic/St | VIN |
|---|---|---|---|---|---|

| Notes | Physical Char |
|---|---|

01/09/08 15:01:43

## Event Report

| | | | |
|---|---|---|---|
| Event ID: 2004-0104-0078 | Call Ref #: 263 | | Date/Time Received: 01/04/04 12:13:25 |

| | | | Services Involved | |
|---|---|---|---|---|
| Rpt #: 2004-00030 | Call Source: PHONE | Prime W157<br>Unit: NASH, STEVEN | LAW | EMS |

Location: 1737 BELMAR BLVD

X-ST: *BORDER BELMAR*  Jur: WTP  Service: LAW  Agency: WTP
*GANNET LN*  St/Beat: PST2  District: 2  RA: N1

Business:  Phone: ( )  -

Nature: **OFFICER WANTED**  Alarm Lvl: 1  Priority: 9  Medical Priority:

Reclassified Nature:

Caller: VILLARI,DAVID  Alarm:

Addr:  Phone: (201) 247-4878  Alarm Type:

Vehicle #:  St:  Report Only: No  Race:  Sex:  Age:

Call Taker: W568  Console: WALLDISP1

Geo-Verified Addr.: Yes  Nature Summary Code:  Disposition: REPT  Close Comments:

Notes: *See Event Notes Addendum at end of this report*

### Times

| | | | | |
|---|---|---|---|---|
| Call Received: 01/04/04 12:13:25 | Time From Call Received | | | |
| Call Routed: 01/04/04 12:16:50 | 000:03:25 | | Unit Reaction: 000:05:05 | *(1st Dispatch to 1st Arrive)* |
| Call Take Finished: 01/04/04 12:16:50 | 000:03:25 | | En-Route: 000:00:03 | *(1st Dispatch to 1st En-Route)* |
| 1st Dispatch: 01/04/04 12:16:56 | 000:03:31 | *(Time Held)* | On-Scene: 001:55:09 | *(1st Arrive to Last Clear)* |
| 1st En-Route: 01/04/04 12:16:59 | 000:03:34 | | | |
| 1st Arrive: 01/04/04 12:22:01 | 000:08:36 | *(Reaction Time)* | | |
| Last Clear: 01/04/04 14:17:10 | 002:03:45 | | | |

### Radio Log

| Unit | Empl ID | Type | Description | Time Stamp | Comments | Close Code | User |
|---|---|---|---|---|---|---|---|
| W157 | 157 | D | Dispatched | 01/04/04 12:16:56 | Stat/Beat: PST2 | | W568 |
| W157 | 157 | E | En-Route | 01/04/04 12:16:59 | | | W568 |
| W157 | 157 | A | Arrived | 01/04/04 12:22:01 | | | W568 |
| W119 | 119 | D | Dispatched | 01/04/04 12:37:55 | Stat/Beat: SGT | | W568 |
| W119 | 119 | A | Arrived | 01/04/04 12:37:57 | | | W568 |
| W119 | 119 | C | Cleared | 01/04/04 12:47:07 | | 1008 | Unit:W11 |
| W142 | 142 | D | Dispatched | 01/04/04 13:21:01 | Stat/Beat: TEU | | W568 |
| W153 | 153 | D | Dispatched | 01/04/04 13:21:04 | | | W568 |
| W153 | 153 | E | En-Route | 01/04/04 13:21:04 | | | W568 |
| W142 | 142 | A | Arrived | 01/04/04 13:21:06 | | | W568 |
| W153 | 153 | A | Arrived | 01/04/04 13:21:08 | | | W568 |
| W142 | 142 | C | Cleared | 01/04/04 14:16:57 | | 1010 | W565 |
| W153 | 153 | C | Cleared | 01/04/04 14:17:05 | | 1010 | W565 |
| W157 | 157 | C | Cleared | 01/04/04 14:17:10 | | REPT | W565 |

7

| | EmplID | Type | Description | Time Stamp | Comments | Close Code | User |
|---|---|---|---|---|---|---|---|
| | | | | | Event Log | | |
| | | TR | Time Received | 01/04/04 12:13:25 | By: PHONE | | W568 |
| | | ENT | Entered Street | 01/04/04 12:13:31 | 1737 BELMAR BLVD | | W568 |
| | | ENT | Entered Nature | 01/04/04 12:13:36 | OFFICER WANTED | | W568 |
| | | ENT | Entered CallerNm | 01/04/04 12:15:55 | VALARO,ROBERT | | W568 |
| | | ENT | Entered CallerPh | 01/04/04 12:16:00 | 7322012474 | | W568 |
| | | CHG | Changed CallerPh | 01/04/04 12:16:08 | 7322012474 --> | | W568 |
| | | CHG | Changed CallerAddr | 01/04/04 12:16:09 | 1737 BELMAR BLVD --> | | W568 |
| | | ENT | Entered CallerPh | 01/04/04 12:16:13 | 2012474878 | | W568 |
| | | ENT | Entered Remarks | 01/04/04 12:16:50 | | | W568 |
| | | FIN | Finished Call Taking | 01/04/04 12:16:50 | | | W568 |
| | | SP | Spawned | 01/04/04 12:27:55 | Spawned EMS event #200401040079 | | W529 |
| | | FF | Fast Forward to EMS | 01/04/04 12:27:55 | EMS | | W529 |
| | | ARM | Added Remarks | 01/04/04 12:36:08 | | | W568 |
| | | CHG | Changed CallerNm | 01/04/04 12:38:08 | VALARO,ROBERT --> VALARO,DAVID | | W568 |
| | | RPI | Requested Report# | 01/04/04 13:21:10 | WTPD Report #2004-00030 | | W568 |
| | | ARM | Added Remarks | 01/04/04 13:24:47 | | | W565 |
| | | CHG | Changed NOTES | 10/04/05 11:21:07 | sr [01/04/2004 15:17:38 W119] | | W410 |
| | | ARM | Added Remarks | 10/04/05 11:21:32 | | | W410 |
| | | CHG | Changed NOTES | 10/04/05 11:21:35 | EXPUNGED (DO NOT GIVE OUT | | W410 |

## Event Notes Addendum

Notes: EXPUNGED (DO NOT GIVE OUT RECORDS) [10/04/05 11:21:32 W410]
 sr [01/04/2004 15:17:38 W119]
 Accused: David K Villari DOB 3/01/65 Wall 1228 Andover Brick NJ
 Accused: Robert J Bodtmann DOB 5/31/63 416 Salem Ave Spring Lake NJ 732-280-5155

 Villari and Bodtmann got into an altercation while Bodtmann went to 1737 Belmar Blvd. Bodtmann was hit in the left arm with
 a shovel. Villari then broke out two windows on Bodtmanns vehicle. Bodtmann's two children (Christina 8yoa 12/7/95 and
 Joseph 6yoa 6/15/97) were in the vehicle as Villari broke out the windows. Bodtmann than drove around Villari's house 2xs.
 Bodtmann then drove off the property to polices headquarters to report the incident. Villari called the police at the same time to
 report the incident.

 Botdmann was tranportced to JSMC for a large welt on his left arm and minor bleeding from the face. Bodtmann was arrested
 for criminal mischief.

 Villari was arrested for 3 counts of agg assault, 2 counts of endangering welfare of a child, criminal mischief for damage to the
 vehicle, possesion of a weapon for unlawful purpose.
  [01/04/2004 14:51:40 W157]
 10-4]
 153 ESCORT ONE 41 TO JSMC [01/04/04 13:24:47 W565]
 10-4] CRIMINAL MISCHIEF [01/04/04 12:36:08 W568]
 NEIGHBOR TRIED TO RUN COMP OVER W/GREEN MINI VAN  FLED ON BELMAR BLVD UNK DIRECTION
 [01/04/04 12:16:50 W568]



# EXHIBIT D -

# Plaintiff

# David K. Villari

# Deposition Transcript

# (Attached)

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
               DISTRICT OF NEW JERSEY
 2              CIVIL ACTION NO. 06-4' (FLW)

 3  DAVID K. VILLARI,     :      CIVIL ACTION
                          :      Deposition Upon
 4       Plaintiff,       :      Oral Examination
                          :
 5       vs.              :      of
                          :
 6  TOWNSHIP OF WALL, et als, :
                          :      DAVID K. VILLARI
 7       Defendants.
 8  ------------------------

 9

10           TRANSCRIPT of the deposition of

11  DAVID K. VILLARI, called for Oral Examination in the

12  above-entitled action, said deposition being taken

13  pursuant to District Court Rules of Civil Procedure,

14  by and before NANCY A. BOUSELLI, a Certified Court

15  Reporter and Notary Public of the State of New

16  Jersey, at the offices of Chamlin, Rosen, Uliano &

17  Witherington, Esqs., 268 Norwood Avenue, West Long

18  Branch, New Jersey, on Friday, February 1, 2008,

19  commencing at 10:30 in the forenoon.

20

21

22              RICHARD F. DURIK
               Certified Court Reporters
23               5025 Medill Road
             Farmingdale, New Jersey 07727
24                (732) 938-5906

25
```

**Page 3**

```
 1              LITIGATION SUPPORT PAGE

 2  Direction To Witness Not To Answer:

 3  Page              Line
              (None)
 4
    Request For Production Of Documents
 5
    Page              Line
 6
 7               15
 7  Deposition Transcript

 8  35               17
    Lease
 9
    43               21
10  Police Report

11  124              19
    Page from 2003 Tax Return
12
    48               17
13  Police Report

14  53               16
    Criminal Complaint
15
    61                1
16  Complaints

17  66               24
    Criminal Charges
18
    Information To Be Furnished
19
    Page              Line
20            (None)

21  Questions Marked For A Ruling

22  Page              Line
              (None)
23

24

25
```

112, 126
136, 105

**Page 2**

```
 1  A P P E A R A N C E S:

 2      LAYNI S. ROTHBORT, ESQ.
        49 Oval Road
 3      Millburn, New Jersey 07041
        Attorney for Plaintiff
 4
    CHAMLIN, ROSEN, ULIANO & WITHERINGTON, ESQS.
 5  BY: JOHN BAZZURRO, ESQ.
        268 Norwood Avenue
 6  West Long Branch, New Jersey 07764
        Attorneys for Defendant, Fifield
 7
        WILLIAM J. GEARTY, ESQ.
 8      301 Morris Avenue, Second Floor
        Spring Lake, New Jersey 07762
 9      Attorney for Defendant, Nash

10
               I N D E X
11
    WITNESS      DIRECT CROSS REDIRECT RECROSS
12
    DAVID K. VILLARI
13
    BY: MR. BAZZURRO    4    221/236
14
       MR. GEARTY      169
15
       MS. ROTHBORT    233
16

17
    EXHIBITS     DESCRIPTION      PAGE
18
    Villari-1    Diagram          141
19
    Villari-2    Answers to       141
20               Interrogatories

21  Villari-3    Complaint        141

22

23

24

25
```

RECEIVED

FEB 1 5 2008

WILLIAM J. GEARTY, PA

**Page 4**

```
 1  D A V I D  K.  V I L L A R I, 1123 Breezy Knoll
 2  Street, Minneola, Florida 34715, having been duly
 3  sworn according to law by the Officer, testified as
 4  follows:

 5

 6  DIRECT EXAMINATION
 7  BY MR. BAZZURRO:
 8          MR. BAZZURRO:  Before we start I would
 9  like to place a statement on the record.  Mr.
10  Bonello, who represents the Township as well as a
11  number of police officers in this matter, has advised
12  that he was unavailable on this date.  Given the
13  difficulty in getting the Plaintiff because he is in
14  Florida and representation of Plaintiff's counsel
15  that he's only available on January 31 and today,
16  February 1, it was agreed by defense counsel,
17  including Mr. Bonello, that we would proceed with the
18  Plaintiff's deposition without Mr. Bonello and that
19  we could proceed without him and he's fully aware
20  that the deposition is taking place today and, with
21  that, we can go forward with the deposition.
22      Q.  Having said that, good morning, Mr.
23  Villari.
24      A.  Good morning, sir.
25      Q.  We're here today for the purposes of
```

Page 49

1    A.   But the whole environment on that day,
2  I was treated like I was a criminal.
3    Q.   But you weren't arrested, were you?
4    A.   No, but just the whole attitude,
5  telling me, "If we catch you on your property you're
6  going to get arrested," and I have three other
7  tenants living there and as a landlord I have to take
8  care of their needs, but I couldn't go to my property
9  because I had the tenants threatening me, the
10  Bodtmanns, and the police threatening me if my father
11  or I got caught on there we were going to get
12  arrested.
13    Q.   What exactly did the police officer say
14  concerning your returning to the property?  Do you
15  recall his exact words?
16    A.   "If I catch you there, I will arrest
17  you.  If your father is caught there, he will be
18  charged with trespassing."
19    Q.   Okay.  He used the word "there."  He
20  didn't say "on your property."  He said, "If you're
21  caught there, you'll be arrested"?
22    A.   Meaning 1737 Belmar Boulevard.
23    Q.   His exact words were "there"?
24    A.   I believe so.
25    Q.   Okay.  And you took that to mean at the

Page 50

1  property?
2    A.   I questioned it.  I said, "Are you
3  telling me I can't go to my property on Belmar
4  Boulevard?"  And he said, "Yes."
5    Q.   Okay.  You specifically asked him,
6  "Does that mean that I can't go to my property"?
7    A.   Yes.
8    Q.   And he said yes?
9    A.   Uh-huh.
10    Q.   Yes?  You have to say yes.
11    A.   Yes.  Sorry.
12    Q.   And did you ask him why you were
13  prohibited from going back to the property you owned?
14    A.   I asked him.  I didn't really get an
15  answer from him at all.
16    Q.   Okay.
17    A.   I thought the whole incident was
18  strange.
19    Q.   Did you ask to speak to any other
20  police officers such as the Captain or a Chief or
21  Sergeant or anything else?
22    A.   After we got the report from that
23  incident, my social security number and address was
24  given out to the Bodtmanns and I asked the
25  Sergeant -- I don't know the Sergeant.  I came back

Page 51

1  another day.  I said, "You guys didn't block out my
2  address, my home address and my social security
3  number," and the Sergeant verified it and he asked me
4  to bring some information back because I didn't have
5  everything with me.  I did and the next time I went
6  back in -- the Sergeant was polite to me.  He said,
7  "Bring the information back."  I believe the next
8  time is the first time I ran into Fifield, but I
9  can't be sure of that and I said, "I need to see the
10  Sergeant," and he started yelling at me; "You could
11  leave it with me."  I said, "The Sergeant asked me to
12  give it to him personally," and basically he was
13  questioning me, who am I asking for a Sergeant, how
14  dare I ask for a Sergeant.
15    Q.   Okay.  Let me go back.  You just gave
16  me a lot of information.  You read the report made on
17  September 3, 2003, yes?
18    A.   Yes.
19    Q.   And did you read it on or about
20  September 3, 2003?
21    A.   There and then when I got home.
22    Q.   Okay.  And was that report, the
23  contents of that report, was it accurate?
24    A.   From what I believe.
25    Q.   Okay.  So the officer, badge number

Page 52

1  151, who said, "Don't go back to the property
2  otherwise you'll be arrested," actually took a
3  report?
4    A.   Yes.
5    Q.   And what you said to him was in the
6  report about the threats that Cindy and Robert had
7  made to you?
8    A.   Yes, sir.
9    Q.   Okay.  Did he say anywhere in that
10  report that you, meaning you, should not return to
11  the property otherwise you'll be arrested?
12    A.   I do not believe so.  That was a verbal
13  order my him.
14    Q.   Okay.
15    A.   Command, if you want to say it.
16    Q.   And how did you find out that your
17  social security number and address were given out to
18  the Bodtmanns?
19    A.   Because I sent a copy I believe to
20  Layni at the time and Layni said, "You know they
21  didn't block out everything," and then I went back
22  and talked to the Sergeant to make sure they blocked
23  it out and the Sergeant confirmed because when I
24  asked for a copy from the people, nothing was blocked
25  out and I said, "Aren't you supposed to block out

Page 109

before you swung your shovel with the intent of hitting the front driver's side window?
A. I don't know exactly. Less than 30 seconds.
Q. Okay. Was it more than five seconds?
A. I'm not sure.
Q. Okay. And did his van move at all between the time you swung and struck the front driver's side window and the time you swung and struck the rear driver's side window?
A. I'm not sure.
Q. Okay. Did at any point in time you or your father call the police before you struck the van with the shovel?
A. No.
Q. Did either you or your father have a cell phone on you?
A. The phone was in the car, so it wasn't on the body.
Q. Okay. And after you swung, struck and broke the rear driver's side window, what happened next?
A. Robert Bodtmann took off.
Q. Okay. And did he go in the same direction he had gone the prior two times?

Page 110

A. Yes.
Q. Did you believe he was coming back?
A. I wasn't sure and I told my father, Let's walk towards the house, and that's when I walked -- can I have a pen, please? There is a porch here (indicating).
Q. Okay.
A. And you could see around the front, so I looked around the front and I told my father, "Stay back here because, you know, I looked and I think he left this time, Dad," and we walked and I go, "You got the cell phone?" He said, "No. I thought he had it and it was in the car."
Q. Okay. What did you do? Did you ultimately get the cell phone?
A. Yes.
Q. What did you do when you got the cell phone?
A. Called the Wall police immediately.
Q. What did you tell them when you called them?
A. That I was almost run over. I'm not sure if I said by a former tenant or I said Robert Bodtmann. He came after me and tried to run my Dad and myself over. Can you please send help?

Page 111

Q. How much time elapsed between the time that Bodtmann left and the time you made that phone call to the police department?
A. I would say a couple of minutes; two or three minutes. I mean, I ran up front to see and that's it. Can I get a drink of water, please?
Q. Sure. Absolutely.
(Recess taken.)
Q. When you called Wall Township Police Department to complain about the incident, did you have any conversations with any of the police officers?
A. The dispatcher.
Q. Okay. Do you know who the dispatcher was?
A. No, I don't.
Q. And what did they tell you?
A. Stay where you are.
Q. Okay. Did officers ultimately arrive at the house?
A. Yes.
Q. How many officers and how many cars?
A. One car initially was Officer Nash.
Q. Okay.
A. And I believe about 15 or 20 minutes

Page 112

later Officer Fifield.
Q. And when Nash arrived, did you speak with him?
A. Yes, I did.
Q. What did you tell Nash happened?
A. I told him what happened. I handed him the shovel and told him exactly where it happened. He looked in the house. I showed him it was vacant. I showed him the front yard where there was divots running around the house, two sets. I walked him back and told him where the incident happened. Officer Nash was a gentleman. I'm like, the first time a nice cop came without yelling at me from Wall.
Q. And so he took your complaint, basically what you told him happened?
A. He didn't write anything down, I believe, but he took the shovel and we basically went over what happened. I told him I called the dispatcher and very nice, very polite. He was a gentleman and I told him my father wasn't feeling well. He asked if my father needed any help. He said no and we were in the back when Fifield showed up and --
Q. Before we get to that, had you ever had any conversations with Officer Nash before this day?

VILLARI VS. WALLI, ET AL.          Condensed It!          DAVID R. VILLARI

---

**Page 113**

1     A. None that I believe.

2     Q. Okay. When you were striking the

3 vehicle with the shovel, did you strike Mr. Bodtmann

4 with the shovel?

5     A. Not that I know of.

6     Q. Okay. Was it possible that you struck

7 him when you struck the front window?

8       MR. BAZZURRO: Don't shake your head.

9 You've been doing it all deposition. I haven't said

10 anything. Your client is looking at you. You may

11 not know your client is looking at you, but he's

12 looking at you.

13     Q. Is it possible that you struck Mr.

14 Bodtmann with the shovel when you broke the front

15 driver's side window of the van?

16     A. It could have.

17     Q. Did you strike any other portion of the

18 van other than the front windshield and the two

19 windows that we discussed?

20     A. Not that I recall.

21     Q. Do you know whether or not there was

22 any dents on the body portion of the van as opposed

23 to windows from the shovel that you used to strike

24 the van?

25     A. Not that I recall.

---

**Page 114**

1     Q. Is it possible that there could have

2 been dents in the body portion of the van other than

3 the windows?

4     A. I'm not sure.

5     Q. Okay. It's possible that that could

6 have happened?

7     A. It could have happened. I'm not sure,

8 sir.

9     Q. Okay. While you were talking to

10 Officer Nash did Officer Nash receive a call from

11 dispatch, either by way of cell phone or by way of

12 radio, if you know?

13     A. He never that I know of got back in the

14 car or I believe they carry a walkie-talkie. I never

15 saw him grab the radio from his shoulder and he never

16 went back into the car that I know of.

17     Q. Okay. And Officer Fifield, what

18 happened when he arrived?

19     A. Oh, he was arrogant, screaming and

20 yelling at my father and I and bumping into me.

21     Q. Well, let me --

22     A. I'm going too fast.

23     Q. When he first arrived, did he first

24 speak to you or did he first speak to Officer Nash?

25     A. Oh, he came right towards me.

---

**Page 115**

1     Q. And what was the first thing he said to

2 you?

3     A. What the fuck did you do? And I said,

4 "I'm explaining to Officer Nash what happened," and

5 he was in my face and bumping into me and I kept on

6 backing up like this (indicating). Sorry.

7     Q. I understand.

8     A. Backing up and he kept on coming into

9 me and bumping into me. He goes, "What's your

10 fucking problem?" I said, "I don't want no problem

11 with you," and then I saw his badge number and I

12 said, "Dad, don't say another word. We're in

13 trouble."

14     Q. Why did you say that?

15     A. Because of the threat on December 17.

16 Fifield said to me, "If I catch you on the property

17 you're going to get arrested," and Fifield, I go, "I

18 don't want no problems with you and I don't

19 understand." My father said, "Please stop bumping

20 into my son." "Fuck you; two fucking stupid

21 guineas," and all Officer Nash did, looked down in a

22 sense of embarrassment. He was an officer that was a

23 gentleman; didn't make any judgment and then you had

24 this like a gorilla coming after me, bumping into me,

25 seeing if I was going to react to him and the next

---

**Page 116**

1 thing, he goes, "Get up against the patrol car;

2 you're under arrest."

3     Q. Before we get there, how did he bump

4 into you? Tell me how exactly he bumped into you.

5 Did he walk by into you and brush against you?

6     A. No, he came in and bumped into me like

7 that (indicating) and then I stepped back and he

8 caught me with the shoulder a second time too.

9     Q. So you're saying that he walked up to

10 you face-to-face and put his chest on to your chest

11 and bumped you?

12     A. Yes.

13     Q. And he did it again, but the next time

14 he used his shoulder?

15     A. Yes.

16     Q. What shoulder did he use, right or

17 left?

18     A. I don't recall because I kept on

19 stepping back to avoid contact.

20     Q. Which part of your body did his

21 shoulder come into contact with?

22     A. I believe it was my left.

23     Q. Okay. So his shoulder came into

24 contact with your left shoulder?

25     A. Yes.

---

**RICHARD F. DURIK & ASSOCIATES**              

---

**Page 117**

1   Q.  Okay. And he called you a fucking
2 stupid guinea?
3   A.  He called both me and my father a
4 fucking stupid guinea and that's when I -- sorry.
5   Q.  Go ahead. That's fine.
6   A.  I noticed his badge number and I said,
7 "Dad, don't say another word. I'm in trouble."
8   Q.  And how long after you said that did he
9 place you under arrest?
10   A.  Probably about two or three minutes.
11   Q.  Okay. Did he actually place you under
12 arrest?
13   A.  Yes.
14   Q.  Did he say he was placing you under
15 arrest?
16   A.  He said, "Lean against the car; put
17 your hands behind your back; you're under arrest."
18   Q.  Where on the property did this take
19 place? First of all, I want to know where you were
20 when Officer Fifield first arrived.
21   A.  The back of the house. Do you want me
22 to draw it?
23   Q.  Just show me.
24   A.  Okay. Back here (indicating).
25   Q.  Okay. So you're indicating right near

---

**Page 118**

1 the "P" in "parking spaces" in the back of the house?
2   A.  Yes. Nash's car was parked here and
3 Fifield came around and parked right here
4 (indicating).
5   Q.  Fifield drove actually on the back of
6 the house to the gravel dirt driveway?
7   A.  Yes.
8   Q.  And you were standing by the "P" in
9 "parking spaces"?
10   A.  Yes.
11   Q.  Okay. And when he placed you under
12 arrest he told you to lean up against his car?
13   A.  Yes.
14   Q.  And did he frisk you at that point?
15   A.  I don't recall.
16   Q.  Did he place handcuffs on you?
17   A.  Yes, he did.
18   Q.  What was your father doing at that
19 point?
20   A.  My father asked him, Why are you
21 placing him under arrest? And he said, "Shut the
22 fuck up."
23   Q.  And did he ask you to get into the car?
24   A.  He put me in his patrol car.
25   Q.  Did he and Nash have any conversations

---

**Page 119**

1 up to that point in time?
2   A.  Well, while I was in the car they
3 walked towards the shed and I saw Officer Fifield
4 look into the shed and then he came back and I was
5 surprised. Nash took me out of the patrol car.
6   Q.  Okay. When Officer Fifield was walking
7 back from the shed did he have anything with him that
8 he had taken from the shed?
9   A.  No.
10   Q.  Why did Nash take you out of the patrol
11 car?
12   A.  I have no clue, but instincts, he was
13 protecting me.
14   Q.  What did Nash do when he took you out
15 of the patrol car?
16   A.  He said, "You're coming with me," and
17 we walked back to his car. He put me in his car and
18 Fifield was continuing yelling at my father and then
19 at one point I heard him, he was swearing at my
20 father, "You're fucking stupid; fucking dumb
21 guineas. I got your fucking son," and he goes,
22 "Remember, I didn't fucking yell at you," and
23 pointed, and I go to Nash, "Can you please tell him
24 to stop? My father is not a healthy man," and Nash
25 goes, "Can you please leave him alone. He's not a

---

**Page 120**

1 healthy gentleman. He's not feeling well." "I don't
2 give a fuck if he dies or gets sick."
3   Q.  So Nash said that to Fifield to stop
4 and Fifield said, I don't care?
5   A.  He didn't give a fuck if he died or got
6 sick; "He's not my fucking problem" and then Nash
7 took me -- I was in the car already and he asked,
8 "Are you okay?" I'm like, "Yeah," and he said,
9 "Please don't say anything. I have to take you in
10 now since you're under arrest," and he did ask before
11 I got to the police station where you pulled into the
12 back, "Are you okay?" And I said -- I basically
13 said, "I basically don't understand why I'm under
14 arrest," and he said, "Don't worry; everything will
15 be okay."
16   Q.  So Nash was pretty good to you?
17   A.  He was a gentleman.
18   Q.  All right. Who placed handcuffs on
19 you, Nash or Fifield?
20   A.  Fifield.
21   Q.  Did he injure you in any way when he
22 placed handcuffs on you?
23   A.  He put them on tight.
24   Q.  Did he injure you in any way?
25   A.  No.

---

**Page 133**

1  correct?
2      A.  Correct.
3      Q.  **Do you** know if the lead pipe was ever
4  found at the house or anywhere?
5      A.  I found the lead pipe at the house,
6  which I believe it was.
7      Q.  Okay.  You said you gave that to some
8  attorney, right?
9      A.  Yes, Angelo Bisceglie,
10 B I S C E G L I E.
11     Q.  Do you know if a baseball bat was ever
12 recovered at the house?
13     A.  I was told it was.
14     Q.  Did you ever see it?
15     A.  No, and I heard it was recovered.
16     Q.  You never saw it, though?
17     A.  No.
18     Q.  Would there have been a baseball bat in
19 the shed?
20     A.  I'm not sure.
21     Q.  As you sit here today, do you recall
22 using a baseball bat to strike the Bodtmann vehicle?
23     A.  Never used a baseball bat.
24     Q.  Do you know if Mr. Bodtmann was charged
25 with any criminal charges from the day of the

**Page 134**

1  incident?
2      A.  Criminal mischief, I believe.
3      Q.  Do you know what that is?
4      A.  A misdemeanor.
5      Q.  Do you know what it's for; like what
6  the violation is that triggered that?
7      A.  They said because he went across my
8  grass, and I was told that by the lawyers.
9      Q.  **Do you know** -- did you ever find out
10 whether or not Bodtmann's children were injured as a
11 result of your striking the vehicle with the shovel?
12     A.  The lawyer just told me.
13     Q.  What is your understanding of what
14 injuries the children suffered?
15     A.  I don't recall.
16     Q.  After your father returned with the
17 $17,500 check, were you released?
18     A.  Yes.
19     Q.  Who released you?
20     A.  Oh, I don't know the officer.
21     Q.  You don't know his name?
22     A.  No.
23     Q.  Do you know his badge number?
24     A.  No, I don't.
25     Q.  And I'm assuming you walked out of the

**Page 135**

1  police department that night?
2      A.  Yes.
3      Q.  Your Dad drove you home?
4      A.  Yes.
5      Q.  Did you have any other contact with any
6  other Wall Township police officers while you were
7  there that day other than what you have told me
8  already?
9      A.  Officer Nash, after I was released, in
10 the Wall parking lot when we were walking over to our
11 car.
12     Q.  Okay.  What time was that,
13 approximately?
14     A.  I believe it was around nine o'clock at
15 night.  I lost track of time.
16     Q.  Okay.  And Officer Nash approached you
17 and your Dad?
18     A.  Yes, he was in his patrol car.
19     Q.  And what did he say?
20     A.  And I looked at him and he said, "Are
21 you okay?"  And I said, "Thanks a lot."  He said,
22 "For what?"  I said, "For all the charges you placed
23 on me and $175,000 bail with no ten percent," and he
24 said, "I'm sorry.  I didn't realize they were going
25 to do that to you."

**Page 136**

1      Q.  Okay.  When you said "thanks a lot,"
2  were you being sarcastic?
3      A.  Yes, I was very upset at that point.
4      Q.  Okay.  So despite the fact that Nash
5  was what you said the most polite Wall Township
6  police officer to you to date, you were sarcastic
7  when you walked out?
8      A.  Yes, because I was shocked.  He was a            3
9  gentleman.  He was very polite and I never dreamed he
10 would have done that to me and to this day I still
11 don't believe he pressed the charges.  I believe it's
12 Fifield.
13     Q.  Did you ever see a copy of the criminal
14 complaint?
15     A.  Yes.
16     Q.  Do you know who signed it?
17     A.  Officer Nash.
18     Q.  Did you have any conversations with
19 Officer Nash wherein he told you Officer Fifield made
20 him sign the complaint?
21     A.  No.
22     Q.  Any other contact with any other police
23 officers while you were there that day?
24     A.  I overheard stuff.
25     Q.  Well, that's contact.

# EXHIBIT E

**WILLIAM J. GEARTY, ESQUIRE**
301 Morris Avenue
Spring Lake, New Jersey 07762
Telephone:  (732) 449-1114
Facsimile:  (732) 449-7292
Attorney for defendant, Officer Nash
wgearty@verizon.net
_____

| | | |
|---|---|---|
| DAVID K. VILLARI, | : | UNITED STATES DISTRICT COURT |
| | | DISTRICT OF NEW JERSEY |
| Plaintiff, | : | |
| | | Civil Action No. 06-CV-4 (FLW) |
| v. | : | |
| | | U.S. Magistrate John J. Hughes |
| TOWNSHIP OF WALL, TOWNSHIP OF | : | |
| WALL POLICE DEPARTMENT, SCOTT | | Civil Action |
| FIFIELD, S. NASH, BADGE #157, | : | |
| SERGEANT PROMPHREY, JOHN DOE, | | **CERTIFICATION OF** |
| being a fictitious name, WEARING BADGE | : | |
| #151, SERGEANT E. P. LOKERSON, | | **WILLIAM J. GEARTY, ESQUIRE** |
| BADGE #119, E. LISTER, BADGE #142, | : | |
| MICHAEL MALONE, BADGE #153, John | | |
| Does #1 - 10, | : | |
| | | |
| Defendants. | : | |
| | | |
| | : | |

_____

William J. Gearty, of full age, upon his certification, deposes and says:

1.     I am an attorney at law of the State of New Jersey.  I represent the defendant Officer Steven Nash in the encaptioned matter.

2.     I have reviewed the transcript of the deposition of plaintiff, David K. Villari, which appears as **Exhibit D** herein.

3.     I have selected certain passages from that transcript for reproduction.  The

selections from the transcript which I reproduce are accurate, complete reproductions of the original text of the deposition transcript.

<u>CERTIFICATION</u>

I hereby certify that the foregoing statements made by me are true.  I also certify that the written reports appended are accurate and truthful.

I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

*/s/ William J. Gearty*

_____
Dated:  January 2, 2009                                           WILLIAM J. GEARTY, ESQUIRE

_____

| | |
|---|---|
| DAVID K. VILLARI, | :    UNITED STATES DISTRICT COURT<br>      DISTRICT OF NEW JERSEY |
|       Plaintiff, | : |
| |    Civil Action No. 06-CV-4 (FLW) |
| v. | : |
| | |
| TOWNSHIP OF WALL, TOWNSHIP OF | : |
| WALL POLICE DEPARTMENT, SCOTT | |
| FIFIELD, S. NASH, BADGE #157, | : |
| SERGEANT PROMPHREY, JOHN DOE, | |
| being a fictitious name, WEARING BADGE | : |
| #151, SERGEANT E. P. LOKERSON, | |
| BADGE #119, E. LISTER, BADGE #142, | : |
| MICHAEL MALONE, BADGE #153, John | |
| Does #1 - 10, | : |
| | |
|       Defendants. | : |

_____

_____

## BRIEF OF DEFENDANT STEPHEN NASH

## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

_____

WILLIAM J. GEARTY, ESQUIRE
Attorney for Defendant, Stephen Nash
301 Morris Avenue
Spring Lake, NJ  07762
(732) 449-1114

**TABLE OF CONTENTS**

                                                                          PAGE

Table of Contents        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        i

Table of Citations       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        ii

Procedural History       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        1

Statement of Facts       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        2

Legal Argument

        Point One -   In the Absence of a Genuine
                   Issue of Material Fact, As
                   Here, Summary Judgment Should
                   Be Granted   . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        5

        Point Two -   The Counts Charging False Arrest
                   Against Defendant Nash Should Be
                   Dismissed Under the Doctrine of Qualified
                   Immunity   . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        7

        Point Three -  Plaintiff's Claims of Malicious Prosecution
                   Cannot Be Maintained Under 42 U.S.C. § 1983  . . .        10

        Point Four -  This Defendant Adopts The Reasoning and
                   Authority Set Forth in Companion Briefs
                   By The Attorneys For The Co-Defendants   . . . . . .        11

Conclusion        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        11

# TABLE OF CITATIONS

## <u>CASES</u>

PAGE

*Albright v. Oliver,*
    510 U.S. 266 (1994)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Anderson v. Creighton,*
    483 U.S. 635 (1987)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Anderson v. Liberty Lobby*,
    477 U.S. 242, 91 L.Ed. 2d 202 (1986)  . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Chipollini v. Spencer Gifts*,
    814 F.2d 893,900 (3 Cir.1987)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Harlow v. Fitzgerald*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Howlett v. Rose,*
    496 U.S. 356, 375-378 (1990)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Kirk v. City of Newark,*
    109 N.J. 173, 184 (1988)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Lind v. Schmid,*
    67 N.J. 255 (1975)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Malley v. Briggs,*
    475 U.S. 335 (1986)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*McKinney v. East Orange Municipal Corp.,*
    284 N.J. Super. 639, 648 (App. Div. 1995)
    (citing *Howlett v. Rose*, 496 U.S. 356, 375-378 (1990))  . . . . . . . . . . . 7

*Mitchell v. Forsyth,*
    472 U.S. 511, 526 (1985)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Parratt v. Taylor,*
    451 U.S. 527, 534 - 535  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

                                                                                    PAGE
*Rosefielde v. Falcon Jet Corp.,*
     701 F. Supp. 1053, (DNJ 1988) 1060 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Russell v. Coyle*
     266 N.J. Super. 651, 658 (App. Div. 1993) . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Williams v. Page,*
     160 N.J. Super 354 (App. Div. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10


## <u>STATUTES</u>

42 U.S.C. § 1983      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,10,11

28 U.S.C. § 1331      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1345      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

N.J.S.A. 2C:12-1b(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

N.J.S.A. 2C:12-1b(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

N.J.S.A. 2C:24-4a    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

N.J.S.A. 2C:39-4d    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4


## <u>RULES OF COURT</u>

Federal Rules of Civil Procedure 56 (c)      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5


## <u>OTHER AUTHORITIES</u>

Constitution of the State of New Jersey, Article I,
     Paragraphs 1, 5, 22    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## PROCEDURAL HISTORY

Plaintiff brings this action under 42 U.S.C. § 1983, which provides for a civil action against persons who under color of law deprive a citizen of a federal constitutional right. Plaintiff alleges jurisdiction pursuant to 28 U.S.C. § 1331 and 13345.  In the statement of facts in his complaint, he refers to the defendant Nash, at all relevant times, as a police officer employed by Wall Township and acting under color of law.  This defendant will concede those allegations.

All the allegations made by plaintiff against the defendant Steven Nash occurred on January 4, 2004.  In his complaint against other persons, plaintiff alleges events on dates other than January 4.  None of these refer to the defendant, Steven Nash.  In that Statement of Fact, the limited allegations against Nash are seen in Paragraph Six:  "But Nash removed plaintiff from Fifield's vehicle and placed him in the vehicle he had driven to the scene."

In Paragraph 64, plaintiff alleges that, "Defendants Nash and Fifield knew that Bodtmann no longer resided at 1737 Belmar Boulevard and that he had no right to enter said property on January 4, 2004."

In his first count, he claims discrimination based on his national origin, allegedly in violation of 42 U.S.C. § 1983.

In Count Two, plaintiff alleges malicious prosecution.

In the Third Count, he alleges that remarks of a co-defendant deprived him of property, which constituted a violation of the Fourteenth Amendment rights of plaintiff.

In the Fourth Count, he alleges a false arrest in violation of the Fourth Amendment. He brings the suit under § 1983.

Under Count Five brought under § 1983, he alleges a conspiracy to bring a malicious

prosecution against him.

In Count Six, he makes no allegation against this defendant.

In Count Seven, he alleges that Nash made inappropriate remarks about his ethnic background violating his rights under Article I, Paragraphs 1, 5 and 22 of the Constitution of the State of New Jersey.

In the Eighth Count, he alleges discrimination against him, in violation of the New Jersey Law Against Discrimination.

In the Ninth Count, he makes no allegation as to Nash.

In the Tenth, he claims an intentional infliction of emotional harm.

In the Eleventh, he alleges a negligent affliction of emotional harm.

The matter has progressed slowly through the trial court.  Depositions have been taken of all parties.

All defendants make motions for summary judgment.

## STATEMENT OF FACTS

The facts relied upon by this defendant are set forth in his Statement of Material Facts as to Which There is No Genuine Issue, which is seen as **Exhibit A** appended to the moving papers.  This defendant adopts those facts for purposes of this brief and argues thereon.

Stated briefly, Steven Nash was a police officer employed by the Township of Wall, New Jersey on January 4, 2004.  He had never seen plaintiff, Villari, or had any dealing with him prior to the affecting of the Villari arrest on January 4, 2004.

On that date, Officer Nash was on routine patrol.  He was dispatched to 1737 Belmar Boulevard, Wall, New Jersey.  He was advised by the dispatcher that a person on the property had broken the windows out of an automobile operated by one Robert Bodtmann.

The evidence was that there were two side window broken out as well as the front windshield on the driver's side of the car.

Officer Nash was the first officer on the scene.  He spoke to Villari and his father. Villari denied the fact that he had struck Bodtmann with a baseball bat.  He did indicate, however, that he took a shovel and broke out the front windshield and two windows on the driver's side of the Bodtmann vehicle.  Nash had been advised by the dispatcher that as a result of this Joseph Bodtmann had been taken to the hospital for treatment and one of the children seated in the back of the Bodtmann vehicle was also taken to Jersey Shore Medical Center for treatment of the glass inflicted cut.

Nash rather dispassionately asked Villari about the incident.  Villari admitted that he did, in fact, break out the windows with a shovel.  He produced the shovel as evidence.

On the basis of his statement and the information received from the dispatcher, Nash told Villari that he was under arrest.  He placed him temporarily in the squad car operated by co-defendant, Fifield.  Since this was his arrest, he removed him from that car, put him in the backseat of his patrol car and drove without incident to Wall Township Police Headquarters. While there, Villari and his father indicated they would not give a statement.  They didn't. Villari, at headquarters after the investigation had proceeded, was charged with other offenses.  They were:

| | |
|---|---|
| N.J.S.A. 2C:12-1b(2) | Aggravated Assault (Robert Bodtmann) |
| N.J.S.A. 2C:12-1b(3) | Aggravated Assault (Joseph Bodtmann) |
| N.J.S.A. 2C:12-1b(3) | Aggravated Assault (Christina Bodtmann) |
| N.J.S.A. 2C:24-4a | Endangering the Welfare of a Child (Joseph Bodtmann) |
| N.J.S.A. 2C:24-4a | Endangering the Welfare of a Child |

(Christina Bodtmann)

N.J.S.A. 2C:39-4d                    Possession of a Weapon for Unlawful Purpose

Following a delay caused by the necessity to raise bail, plaintiff was released from police headquarters.  Originally, before the suit, Villari made claim that the Monmouth County Prosecutor had discriminated against him and had violated his rights.  At a subsequent date, Villari and Bodtmann appeared in Court and dismissed their charges one against the other.

When Villari started his suit, he did not bring a cause of action against the Monmouth County Prosecutor, nor did he bring any action against Bodtmann whom he alleged assaulted him with a motor vehicle and put him in fear of death.  Villari claims emotional upset.  He also claims financial loss.  The undisputed facts show that there was no loss in the property because in addition to the rent, which he did receive, he sold the property for substantially more than he purchased it for.  Strangely, he does concede that when Officer Nash arrested him, he was nothing but a perfect gentleman who was nice and who was polite.  **See Exhibit A, Paragraph 5; Exhibit D**.

**POINT ONE**

**IN THE ABSENCE OF A GENUINE ISSUE OF
MATERIAL FACT, AS HERE, SUMMARY
JUDGMENT SHOULD BE GRANTED**

The standard to determine a motion for summary judgment is to be found in Federal

Rules of Civil Procedure 56(c).  This rule states that the District Court shall render summary

judgment forthwith

> "…if the pleadings, depositions, answers to interrogatories, and
> admissions on file, together with the affidavits, if any, show
> that there is no genuine issue as to any material fact and that
> the moving party is entitled to a judgment as a matter of
> law…."

The standard has been interpreted by the Supreme Court in three cases, one of which

is *Anderson v. Liberty Lobby*, 477 U.S. 242, 91 L.Ed. 2d 202 (1986).  The mere existence of

some alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment.  The requirement is that there be no genuine issue

of material fact.  *Anderson v. Liberty Lobby*, supra, 477 U.S. at 211, 91 L.Ed. 2d at 248.

Our District Court has, in applying this standard, found that a motion for summary

judgment may be granted unless the evidence, construed in favor of the non-moving party,

is sufficient for a reasonable jury to return a verdict for that party.  *Rosefielde v. Falcon Jet

Corp.*, 701 F.Supp. 1053, (DNJ 1988) 1060.  Any inferences to be drawn from the

underlying facts contained in evidentiary sources submitted to the trial court must be viewed

in a light most favorable to the party opposing the motion *Chipollini v. Spencer Gifts*, 814

F.2d 893, 900 (3 Cir. 1987).

An alleged factual dispute, in a motion for summary judgment, must be genuine. This is to be taken to mean that the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby*, *supra*, 477 U.S. at 211-12, 91 L.Ed. 2d at 248. Thus, as stated before, the fact or facts must have an affect on the outcome of the case, not merely allegations designed to attempt to defeat the motion. The burden to demonstrate the absence of a material fact issue remains with the moving party regardless of which party would have the burden of persuasion at trial. See *Chipollini v. Spencer Gifts*, *supra*, 814 F.2d at 896:

> "If, however, the non-movant will bear the burden of persuasion at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movants' burden of proof at trial."

In conclusion, the granting of summary judgment is appropriate against "a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Rosefielde v. Falcon Jet Corp.*, supra, 701 F.Supp. at 1060.

It is clear from the reasons set forth in this brief that there is no genuine disagreement over a material fact to require the denial of this motion. Additionally, drawing all inferences in favor of the non/movant, it is clear the defendant Nash is entitled to summary judgment as a matter of law.

## POINT TWO

### THE COUNTS CHARGING FALSE ARREST AGAINST DEFENDANT NASH SHOULD BE DISMISSED UNDER THE DOCTRINE OF QUALIFIED IMMUNITY

Police officers and other government officials can defend against a Section 1983 Civil Rights claim by establishing that they are eligible for a qualified or "good faith" immunity.

In cases involving an alleged unlawful arrest, search or seizure, the Supreme Court has interpreted Section 1983 to limit the rights of plaintiffs and to encourage disposition of the actions as a matter of law.  See, *Malley v. Briggs*, 475 U.S. 335 (1986); *Anderson v. Creighton*, 483 U.S. 635 (1987).  The Supreme Court has supported granting summary judgment "on the basis of qualified immunity in suits against government officials as a means of screening out insubstantial claims and shielding government officials from the costs and burdens of trial and discovery."  *Russell v. Coyle*, 266 N.J. Super. 651, 658 (App. Div. 1993).

In order to defend a Section 1983 claim, the police officer must establish either that he acted with probable cause, or, if probable cause did not exist, that a reasonable police officer could have believed in its existence.  *Anderson*, at 641.  See, *Kirk v. City of Newark*, 109 N.J. 173, 184 (1988).  Applying this objective standard, the Supreme Court in *Malley* stated that, "if officers of reasonable competence could disagree on this issue, immunity should be recognized."  475 U.S. 335, 341 (1986).  For this purpose, the objectively reasonable standard is the same standard as is generally applicable for suppression motions in criminal cases.  *McKinney v. East Orange Municipal Corp.*, 284 N.J. Super. 639, 648 (App. Div. 1995) (citing *Howlett v. Rose*, 496 U.S. 356, 375-378 (1990)).

Further, a plaintiff must establish that the right allegedly violated was a "clearly established" right at the time of defendant's action. If the plaintiff cannot prove this then the action against the police officer must be dismissed no matter that a factual dispute may exist. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). "Clearly established" is defined as "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, at 640.

The test for qualified immunity is whether the police officer's conduct was objectively reasonable in light of the facts then known. The Supreme Court in *Harlow v. Fitzgerald* stated that, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. 800, 818 (1987). Several years later, the Supreme Court held that police officers should not be held personally liable for actions they reasonably believed to be lawful. *Anderson*, at 641. See, *Russell, supra*, at 658. The Court continued, holding that the government will be shielded from civil damages liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson*, at 638. A plaintiff's subjective belief about the police officer's actions is irrelevant. *Id.,* at 641. In addition, bare allegations of malice, without more proof, should not deprive a police officer of the qualified immunity. *Harlow, supra*, at 817-818.

Since police officers are allowed discretion when determining if probable cause exists, they are also allowed "ample room for mistaken judgments." *Malley*, at 343. Claims of Section 1983 violations for lack of probable cause will stand, "only where the warrant

application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *Id*, at 344-45.

In the instant matter, the evidence supports the conclusion that Nash had probable cause to affect the Villari arrest. He had information concerning the damage done to the Bodtmann vehicle. He had information concerning the injury to the children caused by the flying glass. He spoke to Villari in terms and in a manner that Villari has characterized as "nice, polite and he was a gentleman." During that discussion, Villari conceded that he indeed did smash the three windows in the car. Based on the knowledge received from the dispatcher and based on the candid admission of the assault by Villari, there was a probable cause to arrest.

If for some reason, however, it could be argued that there was a question about the probability of the cause, the doctrine set forth above shows a good faith immunity, certainly. Nash would certainly have cause to believe that probable cause did indeed exist. If Nash would meet all of the tests set forth above.

It is suggested, however, that the good faith immunity which is relied upon is probably unnecessary because in the objective order there was compelling and substantial evidence before Nash to justify him in arresting the Bodtmanns' assailant.

## POINT THREE

### PLAINTIFF'S CLAIM OF MALICIOUS PROSECUTION CANNOT BE MAINTAINED UNDER 42 U.S.C. § 1983

Count Two of plaintiff's complaint alleges a cause of action sounding in malicious

prosecution.  In Count Five, he alleges a conspiracy to commit the malicious prosecution.  It

is brought in the Federal Court under 42 U.S.C. § 1983.

For four reasons, the cause of action cannot be maintained.

A malicious prosecution action requires proof that (1) the criminal action was

instituted by the defendant against plaintiff; (2) that it was actuated by malice; (3) that there

was an absence of probable cause for proceeding; and (4) that it was terminated favorably to

defendant, *Lind v. Schmid* 67 N.J. 255 (1975).  See also *Williams v. Page* 160 N.J. Super

354 (App. Div. 1978).

In the instant matter, there is no evidence that the prosecution "terminated favorably

to the plaintiff."  Plaintiff had made serious charges against Bodtmann.  Bodtmann made

serious charges against him.  The two appeared in court and mutually dismissed their

claims.  It is noted that following that, the civil suit did not name Bodtmann the active

aggressor as a defendant.  Nor did it name the Monmouth County Prosecutor theretofore

vilified.  For that reason, it cannot be said that the prosecution ended favorably to plaintiff.

A second ground would be the lack of probable cause.  It was clear that the

dispatcher information and the Villari admission constituted probable cause to arrest.

As a third ground for dismissal, the evidence shows Nash never had any prior

dealings with plaintiff.  At all times, he acted in a "nice," "polite" and "gentlemanly"

manner.  There is no evidence of malicious actuation.

As a fourth ground for dismissal, the court should consider that no such action can be brought in the Federal Court under Section 1983 of 42 U.S. Code, if there is an adequate tort remedy for malicious prosecution available in the state court system.  The court is referred to the concurring opinion of Justices Kennedy and Thomas in *Albright v. Oliver* 510 U.S. 266 (1994).  In that opinion, the Justices relied upon the earlier ruling in *Parratt v. Taylor* 451 U.S. 527, 535 - 534 for the proposition that state actor's random and unauthorized deprivation of such a due process interest cannot be challenged under 1983 so long as the state provides an adequate post-deprivation remedy.  New Jersey affords such an opportunity to persons who can prove the cause of action.  Because of the availability of that remedy, the plaintiff's claim is precluded under Section 1983.

## POINT FOUR

**THIS DEFENDANT ADOPTS THE
REASONING AND AUTHORITY
SET FORTH IN COMPANION
BRIEFS BY THE ATTORNEYS FOR
THE CO-DEFENDANTS**

## CONCLUSION

For the foregoing reasons, it is respectfully requested that this Honorable Court dismiss with prejudice the complaint filed by the plaintiff herein.

*/s/ William J. Gearty*

_____

WILLIAM J. GEARTY

Date:  January 2, 2009                               Attorney for the defendant, Nash

**WILLIAM J. GEARTY, ESQUIRE**
301 Morris Avenue
Spring Lake, New Jersey 07762
Telephone:  (732) 449-1114
Facsimile:  (732) 449-7292
Attorney for defendant, Officer Nash
wgearty@verizon.net
_____

| | |
|---|---|
| DAVID K. VILLARI, | :    UNITED STATES DISTRICT COURT |

DAVID K. VILLARI,                          :    UNITED STATES DISTRICT COURT
                                                          DISTRICT OF NEW JERSEY

      Plaintiff,                          :
                                                          Civil Action No. 06-CV-4 (FLW)
v.                                                    :
                                                          U.S. Magistrate John J. Hughes
TOWNSHIP OF WALL, TOWNSHIP OF     :
WALL POLICE DEPARTMENT, SCOTT                Civil Action
FIFIELD, S. NASH, BADGE #157,            :
SERGEANT PROMPHREY, JOHN DOE,         **ORDER GRANTING**
being a fictitious name, WEARING BADGE    :
#151, SERGEANT E. P. LOKERSON,         **SUMMARY JUDGMENT ON**
BADGE #119, E. LISTER, BADGE #142,       :
MICHAEL MALONE, BADGE #153, John      **BEHALF OF DEFENDANT NASH**
Does #1 - 10,                              :

      Defendants.                          :

_____

      This matter having been brought before the Court by William J. Gearty, Esquire,

Attorney for Defendant, Officer Steven Nash, and the Court having reviewed the moving

documents submitted and opposition thereto and having heard the argument of counsel;

      It is on this        day of              , 2009,

      ORDERED that summary judgment is hereby granted to defendant Officer Steven

Nash and against the plaintiff David K. Villari;

IT IS FURTHER ORDERED that a copy of this Order shall be provided to all

counsel within _____ days of the date hereof.

_____
HONORABLE JOHN J. HUGHES
U.S. MAGISTRATE OF THE U.S.
DISTRICT COURT