*NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## THE DISTRICT OF NEW JERSEY

_____
                                          :
DAVID K. VILLARI,                    :
                                          :
          Plaintiff,                 :          Civil Action No. 06-0004  (FLW)
                                          :
     v.                              :
                                          :          **OPINION**
TOWNSHIP OF WALL, et al.,            :
                                          :
          Defendants.                :
_____ :

**WOLFSON, United States District Judge:**

Before the Court are Motions for Summary Judgment brought by Defendants Township of Wall ("Wall"), Township of Wall Police Department ("Wall Police Department") and its police officers Scott Fifield ("Fifield") and Steven Nash ("Nash"), Edward Lokerson ("Lokerson"), Walter Pomphrey ("Pomphrey"), and Michael Malone ("Malone") (collectively, "Defendants"). This suit arises out of an incident on January 4, 2004, during which Defendants allegedly violated several rights secured by the United States Constitution, the New Jersey Constitution, the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, et seq. ("NJLAD"), and subjected Plaintiff David K. Villari ("Plaintiff") to common law torts in effectuating a malicious and wrongful arrest. Plaintiff also moves for Summary Judgment on his Complaint.  The Court has reviewed the record and, for the reasons that follow, Defendants' Motions for Summary Judgment are granted and Plaintiff's Motion for Summary Judgment is denied.

### I. Factual Background and Procedural History

At the time of the relevant incident, Plaintiff owned a multi-family property located at 1737 Belmar Boulevard Wall, New Jersey ("the property") and rented one unit therein to Robert and Cynthia Bodtmann and members of their family ("the Bodtmanns"). Compl. ¶¶ 1, 17, 18. The Wall Police were called to the property fourteen times due to disputes between the Bodtmanns and Plaintiff between July

3, 2003 and December 27, 2003.[1] Fifield Statement of Facts ("Fifield Facts") ¶ 4; Compl. ¶ 19. The

phone calls to the Wall Police Department began soon after Plaintiff initiated eviction proceedings

against the Bodtmanns sometime in July 2003.  Both Plaintiff and the Bodtmanns frequently sought

police assistance, complaining of harassment and how each feared that their safety was in danger when

the other was around. See Certification of John T. Bazzuro ("Bazzuro Certif."), Exhs. D-R, Police

Reports. For instance on October 29, 2003, Plaintiff complained that the Bodtmanns purposefully

disconnected the fire alarms and called the Wall Fire Department to forestall the eviction proceedings.

Bazzuro Certif., Exh. I, 10/20/03 Police Report.  The record also reveals that on several occasions,

Cynthia Bodtmann informed the police that Plaintiff was harassing her.  As a result of Cynthia

Bodtmann's call to the police on December 15, 2003, Fifield allegedly left a message on Plaintiff's

answering machine, requesting that Plaintiff return his call. Fifield Facts ¶ 8; Compl. ¶ 23. Later that

night, when Plaintiff returned Fifield's call, Fifield warned Plaintiff to stop "harassing the Bodtmanns"

and threatened Plaintiff with arrest if he ever returned to the property. Fifield Facts ¶ 10; Compl. ¶ 27.

On January 4, 2004, believing that the Bodtmanns had vacated the premises, Plaintiff and his

father went to the property to inspect it. Fifield Facts ¶ 14; Compl. ¶¶ 28-9. Robert Bodtmann arrived at

the property shortly thereafter and, following a verbal exchange, threatened Plaintiff's life with a lead

pipe. Fifield Facts ¶¶ 15-17; Compl. ¶¶ 29-31. Bodtmann got into his vehicle, drove across the lawn and

began speeding toward Plaintiff and Plaintiff's father. Fifield Facts ¶ 19; Compl. ¶ 33. Plaintiff picked up

a shovel in self-defense and struck Bodtmann's vehicle. Compl. ¶ 35. Bodtmann turned around and drove

the vehicle toward Plaintiff and Plaintiff's father again, and Plaintiff struck the vehicle a second time,

breaking the driver-side windows. Compl. ¶ 37; Fifield Facts ¶ 26. Bodtmann began driving across the

grass a third time and Plaintiff called the Police Department to report that Bodtmann had tried to run him

---

[1] The parties dispute whether or not Fifield was involved in any of these incidents. This fact is immaterial to the resolution of the present Motions, however, as the Court finds that no liability attaches to any of the alleged police conduct. Accordingly, this dispute does not preclude summary judgment.

over. Compl. ¶ 38; Fifield Facts ¶ 28. Officer Nash arrived on the scene shortly thereafter, and Plaintiff explained to him what had happened, including that he had broken Bodtmann's windows. Fifield Facts ¶¶ 29-30, 32. Nash then received a radio communication from police headquarters that Bodtmann had arrived requesting first aid. Fifield Facts ¶ 33. Officer Fifield arrived at the scene after Nash and began screaming at Plaintiff, "bumping" him multiple times, elbowing his side, and referring to Plaintiff and his father as "fucking stupid guineas." Fifield Facts ¶¶ 40-44; Compl. ¶¶ 40-41. Plaintiff and his father were then placed under arrest. Compl. ¶ 44.[2]  After a brief visit to Jersey Shore Medical Center for medical treatment, Bodtmann was arrested for criminal mischief.  Bazzuro Certif., Exh. S, Incident Report.

While in the custody of the Wall Police Department, Plaintiff and his father were denied the opportunity to speak with their attorney for three hours, to use the restroom for at least two hours, and were not given food for over nine hours. Compl. ¶¶ 51-2.

Plaintiff filed this Complaint against Fifield, Nash, the Township of Wall, the Police Department, and other Wall Police Officers including Sergeant Pomphrey, Sergeant Lokerson, Officer Lister, Officer Malone, Badge # 151, and several unnamed officers on January 3, 2006. Defendants separately moved for Summary Judgment on January 1, 2009,[3] January 2 2009,[4] and February 4, 2009.[5] For the reasons that follow, all Defendants' Motions are granted.

**II. Standard of Review**

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a

---

[2]  The parties dispute whether Fifield or Nash actually placed Plaintiff and his father under arrest. This fact is not relevant as the Court finds that probable cause existed for any officer to make the arrest.

[3] Defendant Fifield

[4] Defendant Nash

[5] Defendants Wall, Wall Police Department, Lokerson, Pomphrey, and Malone

matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56(c). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Kaucher, 455 F.3d at 423. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Once the moving party has met this burden, the non-moving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57. "A non-moving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)). Moreover, the non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005). Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at

4

322.

Moreover, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Credibility determinations are the province of the fact finder. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III. Claims Against Wall Township and Wall Police Department

As a preliminary matter, the Court grants summary judgment to Defendants Wall Township and Wall Police Department on all claims. In Count Nine, Plaintiff alleges Municipal and Supervisory Liability against Wall, in violation of 42 U.S.C. § 1983 ("Section 1983") and further he names Wall and Wall Police Department as Defendants in each remaining count in his Complaint based on theories of respondeat superior.[6]

It is well established that a municipality cannot be held liable for the constitutional violations of its employees "unless action pursuant to official municipal policy of some nature caused a constitutional tort" to be committed by such employees. Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 691 (1978). Indeed, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694. Accordingly, a municipality cannot be held liable on solely on the basis of the theory of respondeat superior. Id. at 691; see Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009) (finding allegations that defendants "knew of, condoned, and willfully and maliciously agreed to subject" plaintiff to discrimination insufficient to sustain 1983 supervisory liability claim). A municipality will be liable, however, where its failure to adequately train

---

[6] For purposes of Section 1983 liability, a municipality and its police department are treated as a single entity. Bonenberger v. Plymouth Twp., 132 F.3d 20, 25, n. 4 (3d Cir. 1997). Accordingly, liability as to these Defendants will be discussed solely in terms of Wall Towship.

its police force amounts to deliberate indifference to the constitutional rights of its citizens. City of

Canton v. Harris, 489 U.S. 378, 392 (1989); see also Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir.

1989) (applying City of Canton deliberate indifference standard to claim of individual liability against a

supervisory public official).

      Recently, in light of Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009), the Third Circuit cast doubt on

whether 1983 claims premised solely on the personal knowledge of superiors can overcome a claim of

qualified immunity.  Bayer v. Monroe County Children and Youth Services, --- F.3d ----, 2009 WL

2477627, at *2 n.5 (3d Cir. 2009).  Without resolving the issue, the Bayer Court noted that "'purpose

rather than knowledge is required to impose Bivens liability on the subordinate for unconstitutional

discrimination; the same holds true for an official charged with violations arising from his or her

superintendent responsibilities.'"  Id. (quoting Iqbal, 129 S.Ct. at 1948).

      In order to establish that a municipality is liable for the constitutional violations of its employees

on a theory of deliberate indifference, a plaintiff must establish that policymakers (1) were aware of the

risk of such violations posed by its policies and of alternatives for avoiding them; (2) chose not to pursue

such policies or acquiesced in a longstanding custom of inaction; and (3) that the municipality's inaction

caused the constitutional violation. Simmons v. City of Philadelphia, 947 F.2d 1042, 1064-65 (3d Cir.

1991). A defendant municipality, therefore, will not be liable absent actual knowledge of the risk of

constitutional violations posed by its policies. Cruise v. Marino, 404 F.Supp.2d 656, 671-72 (M.D. Pa.,

2005); see also Iqbal, 129 S.Ct. 1937 (finding municipal liability claim insufficient to comply with Fed.

R. Civ. P. 8 where plaintiff offered no factual allegations to support claim of intentional discrimination).

      Here, Plaintiff alleges municipal and supervisory liability, but the record is devoid of any

evidence of deliberate indifference. Indeed, this allegation is grounded in no support whatsoever beyond

the bald assertion that "[u]pon information and belief, Wall has established a pattern of not disciplining it

[sic] officers for . . . discriminatory behavior." Compl. ¶ 149. Such conclusory allegations, without more

are not enough to preclude summary judgment. Accordingly, summary judgment is granted with respect to Count 9.

Moreover, summary judgment is granted in favor of Wall and Wall Police Department on all remaining counts, as Section 1983 does not create liability for a municipality solely on the theory of respondeat superior, and Plaintiff alleges nothing more with respect to the actions of those Defendants. Furthermore, because the Court grants summary judgment to Defendant police officers on all counts of Plaintiff's Complaint, Wall and Wall Police Department cannot be liable based on the failure to discipline or supervise when these officers acted in accordance with the law. Accordingly, summary judgment is granted to Wall and Wall Police Department on all counts.[7]

**IV. Claims Under 42 U.S.C. § 1983**

In Counts One, Two, Three, Four, Five and Six of his Complaint, Plaintiff alleges violations of 42 U.S.C. § 1983 ("Section 1983"). Specifically, Plaintiff alleges Discrimination, Malicious Prosecution, Deprivation of Property, False Arrest, Conspiracy and Excessive Force, respectively. Defendants counter that summary judgment must be granted to them, as they are shielded by the doctrine of qualified immunity.

Section 1983 prohibits any person acting under color of state law from depriving a citizen of the United States of rights secured by the Constitution. 42 U.S.C. § 1983. The law does not create any substantive rights, but rather provides "an avenue of recovery for the deprivation of established federal constitutional and statutory rights." Salley v. Rodriguez, No. 07-4914, 2008 WL 65106 at *4 (D.N.J. Jan. 4, 2008); see also Groman v. Twp. of Manalapan, 47 F.3d 628, 633 (3d. Cir. 1995). To establish a Section 1983 claim, a plaintiff must demonstrate that the alleged conduct was committed by "(1) a person acting under color of state law and (2) that the conduct deprived him of rights, privileges, or immunities secured by the Constitution of the laws the United States." Stahl v. Main, No. 07-4123, 2008

---

[7] Because all claims are dismissed against Wall Township and Wall Police Department, the discussion of all remaining claims will relate only to the conduct of the Defendant police officers.

WL 2446816 at *3 (D.N.J. June 16, 2008).

However, police officers alleged to have violated an arrestee's well-established Constitutional or statutory rights may be shield from liability by invoking the protections of qualified immunity. Groman, 47 F.3d at 633. "The doctrine of qualified immunity protects government officials 'from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 129 S.Ct. 808, 815 (2009) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity is an immunity from suit rather than a mere defense to liability, therefore, it is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis deleted). "Indeed, . . . the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims' against government officials [will] be resolved prior to discovery." Anderson v. Creighton, 483 U.S. 635, 640, n. 2 (1987). Accordingly, it is important to resolve issues of qualified immunity "at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam).

A district court need not necessarily decide the question of whether a plaintiff has alleged facts to make out a violation of a constitutional right. Pearson, 129 S.Ct. at 818. Indeed, "there will be cases in which a court will rather quickly and easily decide that there was no violation of clearly established law before turning to the more difficult question whether the relevant facts make out a constitutional question at all. In such situations, there is a risk that a court may not devote as much care as it would in other circumstances to the decision of the constitutional issue." Id. at 820. In relaxing the rigid two-step test first set forth in Saucier, the Supreme Court vested district courts with discretion on how best to resolve qualified immunity issues based on the particular facts at hand. See Bayer v. Monroe County Children and Youth Services, --- F.3d ----, 2009 WL 2477627, at *2 (3d Cir. 2009) (citing Pearson, 129 S.Ct. at 818).

Accordingly, the principal question in determining if a defendant police officer is entitled to

8

qualified immunity is whether or not "'reasonable officials in the defendants' position at the relevant time could have believed . . . that their conduct would be unlawful.'" Abdul-Akbar v. Watson, 4 F.3d 195, 202 (3d Cir. 1993) (citing Good v. Dauphin County Social Servs. for Children and Youth, 891 F.2d 1087, 1092 (3d Cir.1989)). Therefore, a police officer will be shielded from liability if reasonable officers in his position would have believed that they were acting within the bounds of the law. Anderson, 483 U.S. at 647-48.

   The doctrine of qualified immunity will shield a defendant police officer from liability under Section 1983 where there was probable cause to effectuate an arrest. See Pierson v. Ray, 386 U.S. 547, 557 (1967). Under Third Circuit law, "[p]robable cause is defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." Sharrar v. Felsing, 128 F.3d 810, 817-818 (3d Cir. 1997) (internal citations omitted). This standard is meant "to safeguard citizens from rash and unreasonable interferences with privacy and to provide leeway for enforcing the law in the community's protection." Id. at 818 (internal citations omitted). "It is the function of the court to determine whether the objective facts available to the officers at the time of arrest were sufficient to justify a reasonable belief that an offense [had been] committed." Id. To defend against a Section 1983 claim, a police officer must establish either that he acted with probable cause or, if probable cause did not exist, that a reasonable officer under the circumstances would have believed in its existence. Anderson, 483 U.S. at 645. "[I]f officers of reasonable competence could disagree on this issue, immunity should be recognized." Malley v. Briggs, 475 U.S. 335, 341 (1986).

   **A. Counts Two and Four: Malicious Prosecution and False Arrest**

   In Counts Two and Four of his Complaint, Plaintiff alleges malicious prosecution and false arrest, respectively, in violation of Section 1983 based on his arrest on January 4, 2004. Specifically, Plaintiff alleges that the Defendant police officers arrested him based solely on malice as evidenced by

comments made during the course of the arrest and during Plaintiff's prior interactions with Fifield. Defendants Fifield, Nash, Lokerson, Malone, and Pomphrey move for summary judgment on these claims, arguing that they are entitled to qualified immunity for their conduct, as there was probable cause for effectuating the arrest of Plaintiff.

While the parties dispute whether Nash or Fifield actually placed Plaintiff under arrest, it is clear that the officers had probable cause for making the arrest. Indeed, Plaintiff admitted to Nash upon his arrival that he had broken several windows during his dispute with Bodtmann. Moreover, while Plaintiff spoke with Nash, Bodtmann had arrived at police headquarters reporting the incident which was then communicated to Wall police officers via radio. It is clear, therefore, that any officer responding to the call on Plaintiff's property would have had probable cause to place him under arrest for his destruction of private property and otherwise violent behavior.

Plaintiff contends, however, that it was not reasonable for the Defendant officers to place him under arrest because Bodtmann was not a credible witness, as evidenced by his prior criminal record. This argument is not persuasive. Probable cause is a factual determination based on the facts and circumstances of a given situation. Sharrar, 128 F.3d at 817-18. The Defendant officers were presented with a scenario during the course of which they were called to Plaintiff's property, received radio communication that Plaintiff had smashed Bodtmann's windows, and Plaintiff himself even admitted to breaking them. Whatever Bodtmann's criminal history may have been, and whatever enmity Officer Fifield may have harbored for Plaintiff, probable cause clearly existed to effectuate an arrest on January 4, 2004 – regardless of whether Fifield, Nash, or any other officer actually made the arrest. Therefore, Defendants' motion for summary judgment is granted with regard to Counts Two and Four.

**B. Count One: Discrimination**

In Count One, Plaintiff alleges that Fifield's discriminatory animus toward Italians formed an improper basis for Plaintiff's arrest and subsequent treatment while detained in police custody. Insofar as

Plaintiff's claim relates to his arrest, the Court has already determined that probable cause existed and it was that basis, and not Fifield's hostility toward Italians, that motivated him to arrest Plaintiff and his father. Indeed, the fact that Bodtmann too was arrested, and both were taken into custody, cuts against Plaintiff's contention that he was singled out based on his ethnic heritage.

Plaintiff's 1983 discrimination claim, however, is not based solely upon his arrest, but also on his subsequent treatment while detained in police headquarters. Specifically, Plaintiff alleges that Defendants made derogatory remarks to him, assaulted him,[8] withheld food from him for nine hours, did not allow him to use the restroom for two hours, and delayed allowing him contact with his attorney for three hours while in police custody. Compl. ¶ 51, 53, 68-74. To sustain a Section 1983 discrimination claim, a plaintiff must demonstrate that the right allegedly violated was clearly established at the time of defendant's actions. Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). A clearly established right is one the contours of which are "sufficiently clear that a reasonable official would understand that what he was doing violates that right." Anderson, 483 U.S. at 640. The Supreme Court has held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1987).

In Bennet v. Holman, 1997 WL 158333 (N.D.Ill. Mar. 31, 1997), the court dismissed a pro se plaintiff's Section 1983 claim based on the withholding of food and water for twenty four hours, finding that such treatment amounts to no more than a "temporary inconvenience" and does not arise to the level of a cognizable Fourteenth Amendment claim. Id. at *2, n. 3. The plaintiff in that case had been arrested for stealing from a supermarket and alleged that food, water, and adequate medical care were withheld from him for over two days while in police custody. The record indicated, however, that he was given

---

[8] The Court will not discuss Plaintiff's allegation insofar as it relates to assault. For the reasons set out in the discussion of "Count Six: Excessive Force," supra, Plaintiff's assault claims do not arise to the level of a violation of Section 1983.

medical treatment within twenty four hours of his arrest. The court found that the deprivation of food, water, and medical care for less than one day could not support plaintiff's Section 1983 claim as minor inconveniences were not cognizable Fourteenth Amendment violations. Id.; see also Johnson v. Pelker, 891 F.2d 136, 138-39 (7th Cir.1989).

Further, the Supreme Court has made clear that the Sixth Amendment guarantees a defendant the right to have an attorney present at all "'critical' stages of the criminal proceedings." Montejo v. Louisiana,129 S.Ct. 2079, 2085 (2009) (citing United States v. Wade, 388 U.S. 218, 227-228 (1967); Powell v. Alabama, 287 U.S. 45, 57 (1932)). Indeed, "[i]t is clear . . . [that a] defendant has the right to the presence of an attorney during any interrogation occurring after the first formal charging proceeding, the point at which the Sixth Amendment right to counsel initially attaches." Moran v. Burbine, 475 U.S. 412, 428 (1986) (emphasis added) (citing United States v. Gouveia, 467 U.S. 180, 187 (1984); Kirby v. Illinois, 406 U.S. 682, 689 (1972) (opinion of Stewart, J.)). Moreover, an accused's right to an attorney is protected by the Fifth and Fourteenth Amendments during the course of a custodial interrogation. Fare v. Michael C., 442 U.S. 707, 709 (1979) (emphasis added) (discussing Miranda v. Arizona, 384 U.S. 436, 444-45 (1966)). The protection offered by an attorney is relevant to the protection of Fifth and Fourteenth Amendment rights to the extent that an attorney can protect the accused from self-incrimination. Withrow v. Williams, 507 U.S. 680, 690-91 (1993).

In the present case, while perhaps inconvenient, uncomfortable and certainly undesirable, Defendants' treatment of Plaintiff in this regard is even less severe than that afforded the plaintiff in Bennett, which that court found to be no more than a temporary inconvenience and not sufficient to sustain a constitutional claim. State officials, like police officers, are shielded from liability to the extent that their conduct does not violate clearly established rights; the Defendant officers in this case cannot be held liable for subjecting Plaintiff to such treatment, especially where precedent exists finding that the deprivation of food and water for much longer periods does not amount to a Section 1983 violation.

Moreover, Plaintiff cannot make out a cognizable Fifth, Sixth, or Fourteenth Amendment claim through his allegation that he was denied the opportunity to speak with his attorney for three hours while in police custody. While it is certainly true that Plaintiff has the right to counsel during the course of criminal proceedings against him, Plaintiff has made no allegation that the Defendant police officers interrogated him during the three hour period in which they allegedly denied him his right to counsel. As the Supreme Court has made clear, the Sixth Amendment right to counsel attaches after formal charges are filed and is applicable during "critical" stages of the proceedings against him. Absent any critical proceedings, such as interrogation, Plaintiff has alleged no harm to his cognizable interests, and certainly no Sixth Amendment violation which would subject Defendants to liability above the protections offered them by the doctrine of qualified immunity.[9]

Even though the allegations, standing alone, do not state a claim for constitutional violations, Plaintiff insists that his treatment was motivated by discriminatory animus towards Italians. To that end, Plaintiff has alleged one incident that possibly reveals a discriminatory intent, i.e., Fifield's repeated usage of the epithet "guineas." That incident, however, was isolated to Fifield and not attributable to the conduct of the unnamed officers who purportedly deprived him of food, water, and the temporary ability to contact his attorney. Personal involvement by a defendant is an indispensable element of a valid legal claim; such personal involvement may exist only where the named defendant violated the plaintiff's rights either by executing the acts at issue himself or herself, or by directing others to violate the plaintiff's rights (or by tolerating past or ongoing misbehavior of subordinates while having both supervisory power and knowledge of these constitutional violations). See Baker v. Monroe Township, 50 F.3d 1186, 1190-91 (3d Cir. 1995); Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988); Arnold v. New Jersey, No. 03-3997, 2007 WL 1381757, *4 (D.N.J. May 09, 2007) Conversely, where no

---

[9]With respect to Plaintiff's Fifth Amendment rights under Miranda and its progeny, Plaintiff concedes the officers informed him of his Miranda rights and does not allege that he was compelled to answer questions without counsel's presence.

personal involvement by the defendant is asserted, the plaintiff's claim against that defendant is subject to dismissal. Rode, 845 F.2d at 1207.

The Court finds that Plaintiff fails to allege that Fifield had any involvement with his post-arrest treatment. Devoid of allegations implicating any individual motivated by his or her hatred of Italians to deprive Plaintiff of basic comforts and the ability to contact his attorney, Plaintiff cannot merely extrapolate from Fifield's statement that all officers in the department were similarly motivated without evidence to that effect. Given that no actions or statements evincing a discriminatory intent on the part of any officer other than Fifield are alleged, it is incumbent upon Plaintiff to allege and prove that: (1) it was Fifield himself who denied Plaintiff access to food, water, and his attorney or (2) Fifield had supervisory authority over the unnamed officers who denied him food and water, and instructed them to do so. At the summary judgment stage, Plaintiff has failed to do either. Accordingly, Defendants' motion for summary judgment on Count One is granted.

### C. Count Three: Deprivation of Property

In Count Three, Plaintiff alleges deprivation of property in violation of the Fourteenth Amendment based on Fifield's threat to arrest Plaintiff if he were to go back onto his own property. Compl. ¶¶ 84-93. This threat, Plaintiff alleges, caused him to avoid his property, thus rendering him unable to perform necessary work and maintenance, due to fear of arrest. Id. He alleges further that this threat came to fruition when he actually was arrested by Fifield on January 4, 2004, the first time he returned to the property. Id.

In Bouldin v. Logan Twp., 2006 WL 770572 (D.N.J. Mar. 27, 2006) the court found "as a matter of law, that it would not be clear to a reasonable police officer" that he "cannot use the threat of arrest to resolve a private dispute when criminal conduct has been ruled out" and as a result, an officer will not be liable for a Section 1983 claim of deprivation of property for threatening arrest. Id. at *5. The plaintiff in that case broke an auctioneer's property while shopping, and the defendant police officer threatened

plaintiff with arrest if he did not compensate the auctioneer. Id. at *1. Assuming arguendo that such a threat did in fact arise to a constitutional violation, the court granted the defendant's motion for summary judgment, holding that it would not be sufficiently clear to a reasonable police officer that threatening to arrest the plaintiff would violate the law in that situation. Id. at *5. To the contrary, that court found that the state of the law suggested that such a threat of arrest cannot suffice to sustain a Section 1983 claim. Id. (citing Smithies v. Bialoglowy, 2001 U.S. Dist. LEXIS 22959 at *4 (D.Conn. Dec. 19, 2001) (dismissing § 1983 action against a police officer who threatened to arrest plaintiff unless she repaid a $400 debt because the officer's conduct "did not depict conduct so arbitrary and irrational as to violate substantive due process.").

The Court must evaluate Fifield's threat to arrest Plaintiff in light of the ongoing, often vitriolic, dispute between the parties. Fifield's alleged threat was prefaced with a warning not to harass the Bodtmanns. In doing so, Fifield made it abundantly clear to Plaintiff the parameters of that warning: if he went to the premises for the purposes of harassing the Bodtmanns, he would be arrested. Given the escalating tension between the parties, and the frequency of police complaints, Fifield's actions were not outside the bounds of reasonable conduct necessary to ensure the safety of all interested parties. Indeed, the events of January 4, 2004 only prove Fifield prescient, that a violent altercation would inevitably occur while the Bodtmanns were still residing at the property. If Plaintiff sought to go onto the property while the eviction proceedings were pending, he assuredly could have sought police escort, especially after voicing concern for his safety to the Wall Police on several occasions. See Bazzuro Certif., Exhs. D-R, Police Reports. Like the defendants in Bouldin and Smithies, Fifield attempted to resolve a dispute by threatening Plaintiff with arrest if he went to the property with the intent to harass the Bodtmanns. Although this case presents a somewhat factually distinguishable scenario in that Plaintiff's property here was not itself the subject of disputed ownership between the parties, Fifield's actions do not seem necessarily unreasonable in light of the property interests held by Bodtmann. See Taylor v. Cisneros, 102

15

F.3d 1334, 1337 (3d Cir.1996) (noting that New Jersey is "quite protective" of residential tenants). Therefore, with a mind to protecting the residential tenant, it was no more unreasonable for Fifield to threaten Plaintiff with arrest in the present circumstances than it was for the defendant officer in <u>Bouldin</u>, where the District of New Jersey found a threat of arrest could not support a Section 1983 claim for deprivation of property.

Even assuming that Fifield's threat was tantamount to an unconstitutional deprivation of Plaintiff's right to use his property, he would nonetheless be shielded by the doctrine of qualified immunity for many of the same reasons stated above. An officer, after reviewing the history between Plaintiff and the Bodtmanns, would not think it unreasonable to use the threat of arrest to prevent a violent altercation.[10] This Court agrees with Fifield that he could have reasonably believed that Plaintiff's only purpose to go to the property before the eviction proceedings were finalized would be to harass the Bodtmanns. As such, Defendants' summary judgment motions as to Count Three are granted.

**D. Count Six: Excessive Force**

In Count Six, Plaintiff brings a claim of excessive force in violation of Section 1983 against Fifield, alleging that Fifield bumped him, screamed profanities at him, and elbowed him, which he claims amount to an excessive use of force, in violation of the "Fourth, Fifth, Eighth, and/or Fourteenth Amendments." Compl. ¶¶ 109-122. Fifield counters that summary judgment must be granted in his favor because allegations of "bumping" without injury are insufficient to sustain an excessive force claim under the Eighth Amendment. As a preliminary matter, both sides seem to misunderstand the law to some extent, as the Supreme Court has made clear that "all claims that law enforcement officers have used excessive force - deadly or not - in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment." <u>Graham v. Connor</u>, 490 U.S. 386, 395

---

[10]Based on Fifield's alleged threat to arrest him if he went back to the property, Plaintiff insists that the threat served as the impetus for his unlawful arrest. However, as discussed <u>supra</u>, both Fifield and Nash had ample justification, besides Plaintiff's entrance onto the property, to take Plaintiff into custody and charge him with criminal mischief.

(1989). As such, Plaintiff's claim of excessive force is dismissed with regard to all but the Fourth Amendment claim.

The use of excessive force can constitute an unlawful "seizure" under the Fourth Amendment. Id.; Carswell v. Borough of Homestead, 381 F.3d 235, 240 (3d Cir. 2004). When construing an excessive force claim, the Court must consider whether the officer's use of force was objectively reasonable under the circumstances, regardless of the official's underlying motive or intention. Graham, 490 U.S. at 397. In Graham, the Supreme Court stated that the reasonableness inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id.; see also Gilles v. Davis, 427 F.3d 197, 207 (3d Cir. 2005) (quoting Kopec v. Tate, 361 F.3d 772, 777 (3d Cir. 2004) (finding an officer was entitled to qualified immunity on excessive force claim "'after resolving all factual disputes in favor of the plaintiff, [] the officer's use of force was objectively reasonable under the circumstances.'"). Moreover, the Third Circuit has noted other relevant factors including "the duration of the [officer's] action, whether the action takes place in the context of effecting an arrest, the possibility the suspect may be armed, and the number of persons with whom the police officers must contend at one time." Sharrar, 128 F.3d at 822.

When weighing these factors, courts should evaluate the officers' conduct from the officers' vantage point at the time of the incident; thus "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' is constitutionally unreasonable." Mayer v. Gottheiner, 382 F. Supp.2d 635, 649 (D.N.J. 2005) (quoting Graham, 490 U.S. at 396). In other words, "reasonableness must embody allowances for the fact that 'police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97.

Applying these factors and considerations, the court in <u>Kelly v. Borough of Carlisle</u>, 2009 WL 1230309 (M.D.Pa. May 04, 2009) held that a defendant police officer was shielded from liability on a Section 1983 excessive force claim by the doctrine of qualified immunity where he "bump[ed]" and "nudge[d]" the plaintiff during the course of the arrest, even though the plaintiff posed no threat to the officers and had not committed a violent crime. <u>Id.</u> at *7. The court there found that even though the non-violent nature of the plaintiff's offense and large number of police officers present at the scene indicated that very little force would be reasonable during the course of an arrest, bumps and nudges could not rise to the level of a constitutional violation, and that even if they could, a reasonable police officer could make the mistake of thinking the conduct to be within the bounds of the law. <u>Id.</u>

Here, Plaintiff alleges that Fifield bumped, elbowed and screamed slurs at him in the course of arresting him. Evaluating Fifield's conduct in light of the relevant factors articulated by the Supreme Court and the Third Circuit, the Court finds that his conduct does not arise to the level of a constitutional violation. While Fifield's actions in this case may seem unnecessary, even gratuitous - especially analyzing them from the "peace of a judge's chambers" - - they were de minimis and left Plaintiff without physical injury.  <u>Saucier</u>, 533 U.S. at 209 ("Our conclusion is confirmed by the uncontested fact that the force was not so excessive that respondent suffered hurt or injury."); <u>Thomas v. City of Erie</u>, 236 Fed.Appx. 772, 776 (3d Cir. 2007) (affirming district court's dismissal of excessive force claim where the plaintiff showed no cognizable injury);  cf <u>Fillmore v. Page</u>, 358 F.3d 496, 504 (7th Cir. 2004) (finding that incidental bumping. . .[is] is not enough to meet the constitutional threshold for excessive force" in the Eighth Amendment context).

In evaluating excessive force claims, this Court may look to the severity of the injury alleged to gauge whether the force used was necessary or was dispensed with the purpose to wantonly or recklessly inflict harm upon the suspect.  <u>Deville v. Marcentel</u>, 567 F.3d 156, 168 (5th Cir. 2009) (citing <u>Whitley v. Albers</u>, 475 U.S. 312, 321 (1986)). The Court finds that Fifield did not intend to inflict any injury on

Plaintiff.  During his deposition, Plaintiff opined to the contrary, that Fifield needlessly nudged and bumped to provoke him into retaliating. Certification of Layni S. Rothbort, Exh. A, Deposition of David K. Villari p. 115; Compl. ¶41.  The lack of physical injury Plaintiff sustained only confirms Fifield's motive. See Jones v. Buchanan, 325 F.3d 520, 530 (4th Cir. 2003) ("the level of force used by [Defendant] caused severe injuries-a nose crushed into numerous pieces, lacerations of the nose and lips, each requiring multiple sutures, and bruised ribs. This is another consideration in determining whether force was excessive").  Without the intent to injure, or any allegations of physical injuries of some magnitude, Plaintiff's excessive force claim must fail.

Moreover, in asserting his excessive force claim, Plaintiff presupposes that his arrest was unjustified.  However, as stated supra, Plaintiff's arrest was amply supported by his alleged conduct. Fifield responded to a call from police headquarters that Bodtmann had arrived complaining that Plaintiff had attacked him with a shovel, breaking several of Bodtmann's car windows, and further, Fifield was aware of a longstanding series of confrontations between Plaintiff and Bodtmann which had warranted police involvement. Moreover, even assuming the unreasonableness of Fifield's conduct in effectuating the arrest, Fifield is shielded by the doctrine of qualified immunity.  Accordingly, Defendant's motion for summary judgment is granted as to Count Six.

### E. Count Five: Conspiracy

Finally, Plaintiff alleges that the Defendant police officers violated 42 U.S.C. § 1985 by conspiring to deprive Plaintiff of his constitutional rights for which Section 1983 provides a cause of action.

Section 1985 provides, in pertinent part that: "If two or more persons . . . conspire . . . for the purpose of depriving . . . any person . . . of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . [or] cause to be done, any act in furtherance of the object of such conspiracy . . . the party so injured or deprived may have an action for the recovery of damages." 42

U.S.C. § 1985(3). "The essential elements of a § 1985(3) claim are: (1) a conspiracy; (2) to deprive plaintiff of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and (4) an injury or deprivation resulting therefrom." Tilton v. Richardson, 6 F.3d 683, 686 (10th Cir. 1993) (citing Griffin v. Breckenridge, 403 U.S. 88, 102-03 (1971)).

Here, the Court has determined that Defendants are not liable for any constitutional violations against Plaintiff. Absent any cognizable injuries or the deprivation of rights resulting from the Defendants' actions, Plaintiff is missing an essential element of a 1985 conspiracy claim. Indeed, the Court finds that Defendants had probable cause for all of their relevant conduct and were not acting pursuant to any malicious intent. As such, Defendants' motion is granted.

**V. State Law Discrimination Claims**

In Counts Seven and Eight, Plaintiff alleges discrimination based on ancestry in violation of the New Jersey State Constitution and NJLAD, respectively. Specifically, he alleges that the Defendant police officers' use of racial slurs, arrest without sufficient basis, and mistreatment during incarceration were racially motivated. Compl. ¶¶ 123-37.

The New Jersey Constitution provides, in pertinent part that:

No person shall be denied the enjoyment of any civil or military right, nor be discriminated against in the exercise of any civil or military right, nor be segregated in the militia or in the public schools, because of religious principles, race, color, ancestry or national origin.

N.J.S.A. Const. Art. 1, ¶ 5. Further, NJLAD provides that it shall be unlawful:

[f]or any . . . public accommodation directly or indirectly . . . to discriminate against any person . . . on account of the race, creed, color, national origin, ancestry . . . or nationality of such person . . .

N.J.S.A. 10:5-12(f)(1); see also Ptaszynski v. Uwaneme, 371 N.J.Super. 333, 347 (App. Div. 2004) (finding that "for purposes of application of the LAD . . . the Township police department - both the building and the individual officers - is a place of public accommodation").

The New Jersey Supreme Court has held that in adjudicating state law discrimination claims,

20

New Jersey courts should adopt the burden of proof standards articulated by the Supreme Court in

McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973), at least to the extent that its application is

appropriate to a plaintiff's particular claims. Peper v. Princeton Univ. Bd. of Trustees, 77 N.J. 55, 83

(1978); see State v. Gilmore, 103 N.J. 508 (1986) (applying McDonnell-Douglas to claim of

discrimination in peremptory challenges to jurors).  In Gilmore, the New Jersey Supreme Court

articulated its modified McDonnell-Douglas standard thus:

> First, the [defendant] has the burden of proving by the preponderance of the evidence a
> prima facie case of discrimination. Second, if the [defendant] succeeds in proving the
> prima facie case, the burden shifts to the [prosecution] to articulate some legitimate,
> nondiscriminatory reason for the [peremptory challenges]. Third, should the
> [prosecution] carry this burden, the [defendant] must then have an opportunity to prove
> by a preponderance of the evidence that the legitimate reasons offered by the
> [prosecution] were not its true reasons, but were a pretext for discrimination.

Id. at 537, n.7. Therefore, the party accused of discrimination, once a prima facie case of discrimination

is established, has the opportunity to rebut the allegation, and the burden falls back on the plaintiff to

show discrimination.

        In the present case, Plaintiff has alleged discrimination as the basis for his arrest and his

treatment thereafter. In evaluating this claim, the Court uses the Gilmore test modified to address the

appropriate inquiries. The Court has already determined that Defendants had probable cause to arrest

Plaintiff and are not liable to him for discriminatory treatment. As such, Plaintiff cannot "prove by a

preponderance of the evidence that the legitimate reasons offered by the [Defendants] were not its true

reasons, but were a pretext for discrimination." Id. Accordingly, summary judgment is granted in favor

of Defendants on Plaintiff's state law discrimination claims.

## VI. State Law Tort Claims

         In Counts Ten and Eleven, Plaintiff alleges Intentional Infliction of Emotional Harm and

Negligent Infliction of Emotional Harm, respectively. Defendants contend that summary judgment must

be granted in their favor because they are immunized from liability pursuant to the New Jersey Tort

Claims Act, N.J.S.A. 59:1, et seq. ("NJTCA").

The NJTCA provides that "[a] public employee is not liable if he acts in good faith in the execution or enforcement of any law." N.J.S.A. 59:3-3. In order to obtain the benefit of immunity under the NJTCA, a public employee must demonstrate either that he acted with objective reasonableness or establish that he acted with subjective good faith. Alston v. City of Camden, 168 N.J. 170, 186 (2001) (citing Fielder v. Stonack, 141 N.J. 101, 131 (1995). Thus, where a defendant public employee can establish either objective reasonableness or subjective good faith, immunity attaches. Id.

Crucially, "[t]he 'objective reasonableness' standard that is used to determine whether a defendant enjoys qualified immunity from actions brought pursuant to 42 U.S.C. § 1983 is used to determine questions of good faith arising under N.J.S.A. 59:3-3." Hill v. Algor, 85 F.Supp.2d 391, 411 (D.N.J. 2000); see Lear v. Twp. of Piscataway, 236 N.J.Super. 550, 554 (1989).

Here, because the Court has already determined that Defendants enjoy qualified immunity under Section 1983, Defendants are immune from liability under NJTCA as well, and summary judgment is granted in favor of Defendants.

**VII. Conclusion**

For the reasons discussed herein, Defendants' Motions for Summary Judgment are granted and Plaintiff's Motion for Summary Judgment is denied.

Dated: September 15, 2009                         _____/s/ Freda L. Wolfson_____
                                                  Honorable Freda L. Wolfson
                                                  United States District Judge